UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| **FAIRCHILD SEMICONDUCTOR CORPORATION,** | ) ) ) | |
| PLAINTIFF | ) ) | |
| v. | ) ) | CIVIL NO. 08-158-P-H |
| **THIRD DIMENSION (3D) SEMICONDUCTOR, INC.,** | ) ) ) ) | |
| DEFENDANT | ) | |

**DECISION AND ORDER ON MOTION FOR A
TEMPORARY RESTRAINING ORDER**

The plaintiff filed a two-count complaint for declaratory judgment and injunctive relief. It seeks a declaration that its products do not infringe the defendant's U.S. Patent No. 5,216,275 (Count 1); and a declaration that it has not breached a license agreement with the defendant and does not owe the defendant any royalties (Count 2). It also seeks injunctive relief related to its claim that the license agreement remains in effect. Now, the plaintiff requests a temporary restraining order ("TRO") preventing the defendant from terminating the license agreement before a hearing on its motion for a preliminary injunction. In a conference with the Magistrate Judge, the parties agreed that the TRO and preliminary injunction could not be heard simultaneously,[1] and that I should decide the TRO request upon the written

---

[1] They have left the request for a preliminary injunction to later proceedings because of complex technological questions and witness availability.

record, with oral argument but no testimonial hearing. I heard oral argument on July 1, 2008. The motion for TRO is **GRANTED.**

### FACTUAL AND PROCEDURAL BACKGROUND

In early 2001, Fairchild Semiconductor Corporation ("Fairchild") entered a non-exclusive Patent License Agreement ("Agreement") with Power Mosfet Technologies, L.L.C. ("Power Mosfet").[2] Fairchild paid an immediate license fee of $15,000 to Power Mosfet. The Agreement licenses Fairchild to practice various patents for metal-oxide-semiconductor field-effect transistors (MOSFETs). It also requires Fairchild to pay royalties of 4.75 percent on Fairchild products covered by "at least one claim" of the licensed patents.[3] On January 31, 2002, Power Mosfet assigned the Agreement to the defendant Third Dimension (3D) Semiconductor, Inc. ("3D"). 3D is now also the owner of the licensed patents.

Fairchild has never paid royalties under the Agreement. Although the Agreement requires an annual accounting by Fairchild of the royalties due 3D, no accounting was ever provided until sometime after April 2008. Not until early 2007 did 3D assert that Fairchild's SuperFET products generated royalties under the Agreement. Then, for the first time, 3D demanded an accounting. The parties met privately on April 17, 2008, as the agreement requires before initiation of litigation, but were unable to resolve their dispute over royalties. The Agreement (paragraph 8.B) allows either party to terminate

---

[2] A copy of the Agreement is attached as Exhibit A to Fairchild's complaint (Docket Item 1).
[3] The licensed patents of the Agreement are: U.S. Patent No. 5,216,275 ("'275 Patent"), U.S. Patent application 08/953,077, Chinese Patent Nos. 91,101,845 and 93,115,356, and "[a]ll other patent applications on derivative inventions filed in the U.S., China, and any other countries." See Agreement, Appendix A.

the Agreement for breach or default by providing sixty days notice. On April 24, 2008, 3D gave notice that it intended to terminate the Agreement in sixty days for what it deemed to be multiple breaches of the Agreement by Fairchild.[4]

The Agreement (paragraph 5.B) requires a party to provide notice and hold a meeting with the other party, and then wait at least 30 days after the meeting before filing a lawsuit. Fairchild complied with the Agreement's requirements before filing its complaint in this court seeking declaratory and injunctive relief.[5]

## ANALYSIS

### (A) Temporary Restraining Order

A TRO is available under Fed. R. Civ. P. 65 to a litigant facing a threat of irreparable harm before a preliminary injunction hearing can be held. See 11A Charles A. Wright, et al., Federal Practice and Procedure § 2951 (1996 & Supp. 2008) ("Wright & Miller"). When the opposing party has notice and an opportunity to respond and an adversarial hearing is held, the standards for issuing a TRO are substantively similar to those for a preliminary injunction. See id. Fairchild, as the moving party, bears the burden of persuasion to show: (1) a substantial likelihood of success on the merits; (2) a significant risk that it will suffer irreparable harm if the TRO is denied; (3) the harm it will suffer

---

[4] During the hearing, 3D clarified that it is alleging four separate breaches of the Agreement by Fairchild: failure to pay royalties, failure to satisfy the annual reporting obligation, failure to provide the required audit upon 3D's request, and suing 3D for a declaration of noninfringement before the Agreement had been terminated.

[5] Counsel for 3D implied at the July 1, 2008 hearing that Fairchild did not comply with the Agreement's procedures because it filed its complaint in this court after waiting only twenty-nine days and twenty-three hours. The Agreement requires a party to wait thirty days. See Agreement, ¶ 5.B. A meeting was held on April 17, 2008 and Fairchild filed this complaint on May 17, 2008, exactly thirty days after the meeting. Nothing in the Agreement suggests that the time period should be measured in hours.

3

outweighs any harm that the TRO will cause to 3D; and (4) the TRO "will promote (or, at least, not denigrate) the public interest." See McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001) (stating the four-factor test for issuance of a preliminary injunction).[6]

### (1) Likelihood of Success on the Merits

Fairchild's complaint asserts that its products do not practice 3D's patents licensed by the Agreement. Fairchild relies on the Federal Circuit's recent construction of the '275 Patent in Power Mosfet Technologies v. Siemens AG, 378 F.3d 1396 (Fed. Cir. 2004). Applying Power Mosfet's claim construction to its own products, Fairchild has submitted a declaration of its own MOSFET engineer that purports to demonstrate how Fairchild's products do not practice the '275 Patent, as it was construed in Power Mosfet. See Decl. of Jaegil Lee in Support of Pl.'s Mot. for TRO (Docket Item 19). Fairchild also provided the declaration of its independent expert stating his belief that Fairchild has not violated one of the Chinese patents covered by the Agreement. See Decl. of Xun (Frank) Feng (Docket Item 20). For this early stage in the litigation, Fairchild has made a convincing demonstration that the relevant features of its SuperFET products are similar to those of the transistors found by the Federal Circuit in Power Mosfet not to infringe the '275 Patent.

In response, 3D asserts, by affidavit of its legal counsel with no supporting documentation, that "3D has reengineered representative Fairchild

---

[6] For present purposes, I note that there is no meaningful difference between First Circuit and Federal Circuit law. See Biogen Idec MA Inc. v. Trustees of Columbia University, 332 F. Supp. 2d 286, 295 (D. Mass. 2004).

4

semiconductor products that show Fairchild parts infringe 3D patents." See Affidavit of Michael W. Shore in Support of 3D's Response to Pl.'s Motion for TRO, ¶ 14 (Docket Item 25-2). 3D does not explain how Fairchild's products infringe any of the patents covered by the Agreement and 3D does not attempt to refute the declarations of Dr. Lee or Mr. Feng. At the July 1, 2008 hearing, 3D argued that Power Mosfet is not entirely determinative of this dispute, because that case construed only one claim under the '275 Patent, whereas the Agreement covers at least six other U.S. patents and two Chinese patents; because additional claims in the '275 Patent not addressed in Power Mosfet could be asserted; and because 3D could argue the doctrine of equivalents.[7]

3D, however, has not presented the claims of any of the other patents covered by the Agreement; it has not explained how other claims under the '275 Patent could distinguish this case from Power Mosfet; and it has not provided any detail regarding the doctrine of equivalents. On the present record, therefore, Fairchild has demonstrated a sufficient likelihood of success on the merits.

### (2) Irreparable Harm

Irreparable harm is an injury "not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). To justify a TRO, the alleged irreparable harm must be more than speculative. See id. But "when the likelihood of success on the merits is great, a movant can show somewhat less in the way of

---

[7] 3D has not clearly explained why it did not pursue these alternative arguments in the Power Mosfet litigation, except to imply that it was a tactical legal decision.

irreparable harm . . . ."  E.E.O.C. v. Astra U.S.A., 94 F.3d 738, 743–744 (1st Cir. 1996).

Fairchild contends that if 3D is allowed to terminate the license Agreement, then 3D will request injunctions and damages in separate patent infringement suits against Fairchild in the U.S. and China, will grant an exclusive license of all the patents to another entity, and will transfer the patents to one of its Chinese subsidiaries.  According to Fairchild, these actions will cause it irreparable harm by eliminating its primary defense against a 3D patent infringement suit[8] and permanently depriving Fairchild of the opportunity of future use of the patents it bargained and paid for in the Agreement.

I do not find that Fairchild would be irreparably harmed by a temporary loss of its license under the Agreement.  Fairchild maintains that its current products are not covered by the licensed patents and that it has no definitive plans to produce any products that would be covered.

But termination of the agreement does create irreparable harm in depriving Fairchild of its primary defense to 3D patent infringement litigation.  The threat of such litigation is not speculative: 3D has already filed a complaint in the United States District Court for the Eastern District of Texas[9] and has promised to file an infringement case in China based on the Chinese patents

---

[8] Fairchild maintains that the "covenants not to sue" in the Agreement (paragraph 3) prohibit 3D from filing such a lawsuit.

[9] 3D's complaint states: 3D "hereby demands a jury trial and brings this action for breach of contract and, to the extent the License Agreement at issue has terminated, for patent infringement against [Fairchild]."  Pl.'s Original Compl. and Jury Demand, Third Dimension Semiconductor, Inc. v. Fairchild Semiconductor Int'l, Inc., No. 6:08cv200 (E.D. Tex. May 17, 2008).  Fairchild's counsel offered a copy of 3D's complaint during oral argument, but I stated that I could access it by the courts' electronic case filing system.

6

otherwise licensed by the Agreement. Without the Agreement as an affirmative defense to those suits, Fairchild could be forced to endure years of litigation in those other forums despite this Court eventually ruling that Fairchild did not breach the Agreement.[10]

### *(3) Balance of Harms*

The TRO should not cause substantial harm to 3D. Its effect is to prevent 3D from terminating the Agreement immediately and pursuing its patent infringement cases in the Eastern District of Texas and possibly China, as well as delaying any 3D plans to grant an exclusive license to another entity. While the TRO may cause some delay to 3D's strategy, the royalties (and potentially damages), if any, owed by Fairchild will be recoverable and readily measurable, and they are the economic quid pro quo that 3D's predecessor bargained for under the Agreement.

3D is correct that the TRO appears to give Fairchild a risk-free ride: it allows Fairchild to litigate the scope of 3D's patents with only the Agreement's royalties at stake, rather than the damages that would be owed for patent infringement.[11] Nevertheless, that is what the Agreement allows and any harm to 3D does not outweigh the potential harm I have described to Fairchild.

---

[10] Fairchild also alleges irreparable harm in the form of lost market share and the disruption of its relationships with its customers due to an injunction issuing from either the Eastern District of Texas or China. However, if Fairchild is correct that its products do not infringe any of the patents covered by the Agreement, then it is difficult to give such a contention much weight.

[11] At oral argument, Fairchild contended that it could potentially owe more than just royalties due under the Agreement if it loses on the merits in this case, specifically that it could be held liable for patent infringement damages and that 3D then would be allowed to terminate the Agreement regardless of any royalties paid by Fairchild.

7

Furthermore, the bond that I require Fairchild to post will secure royalties until the preliminary injunction hearing.

### *(4) Public Interest*

Neither party has persuasively presented a public interest in this litigation.

I conclude, therefore, that Fairchild has met its burden for issuing the TRO.

## (B) Other Arguments by 3D

### *(1) International Antisuit Injunction*

3D argues that issuing a TRO that prevents it from terminating the Agreement is effectively an antisuit injunction against foreign litigation that the caselaw prohibits. See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11 (1st Cir. 2004); Stein Associates, Inc. v. Heat and Control, Inc., 748 F.2d 653 (Fed. Cir. 1984). It is true that the TRO's practical effect may prevent 3D from filing a patent infringement suit in China (or at least keep Fairchild's affirmative defense to such a suit intact), but that is a result of the terms of the Agreement negotiated by 3D. It does not implicate the concerns associated with an actual international antisuit injunction. See Quaak, 361 F.3d at 16–19.

### *(2) Reformation of the Agreement*

3D views the TRO as an impermissible reformation of the Agreement. It argues that the terms of the Agreement require termination of the Agreement before Fairchild can initiate litigation, or alternatively that Fairchild must pay royalties while it is litigating.

The only provision of the Agreement that directly addresses a dispute over the scope or validity of a licensed patent is paragraph 6.B. That paragraph allows Fairchild to terminate the Agreement prospectively (after good faith discussions and thirty days notice) if it discovers evidentiary material that affects the scope or validity of an underlying patent. Thus, paragraph 6.B. addresses Fairchild's right to *terminate* the Agreement, but does not affect its ability to litigate 3D's unilateral assessment of the scope of the licensed patents.[12] 3D also points to paragraph 8.C[13] as requiring termination of the Agreement before Fairchild can pursue its claims. But the language of paragraph 8(c) does not bear 3D's interpretation; it speaks to what happens upon termination, not what is permissible *before* termination.

The most relevant paragraph is 5.B. It states:

> [B]efore seeking any redress for any dispute in any court (including redress for any allegations of breach of any term of this Agreement), a party shall provide notice to the other of the dispute . . . [a] meeting shall take place within thirty (30) days of the date of the written notice . . . . In no event shall a party file a lawsuit in any jurisdiction to resolve such dispute for at least thirty (30) days following the meeting.

Before filing this complaint, Fairchild complied with these procedures.

3D also argues that the TRO effectively and impermissibly extends the Agreement's thirty-day cure period to the duration required for completing these proceedings. That may be the TRO's practical effect, but the Agreement

---

[12] Under 6.B, if Fairchild contests the *validity* of a licensed patent and also withholds royalties, then 3D may declare the Agreement terminated. Here, Fairchild is not contesting the validity of a patent.

[13] Paragraph 8.C states: "Upon termination of this Agreement, all rights and licenses granted hereunder shall terminate and each party shall have all legal and equitable rights for any claims, including patent infringement, patent invalidity and/or unenforceability, along with all other remedies or claims."

9

in no way (explicitly or implicitly) forecloses Fairchild from this type of declaratory judgment relief permitted by law. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).

### (C) *The Duration of the TRO and the Security Required*

The TRO will remain in force until a decision upon Fairchild's request for a preliminary injunction. An expedited discovery and briefing schedule to that end is appropriate, and the Clerk's Office shall schedule a prompt conference with the Magistrate Judge accordingly. Consolidation of the merits trial with the preliminary injunction hearing shall also be considered at the conference.

Fed. R. Civ. P. 65(c) permits issuance of a TRO upon posting security sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." The amount of the security should reflect the pecuniary costs that will be incurred because of the TRO; it is the "limit of the damages the defendant can obtain for [issuance of a wrongful TRO]." See Global Naps, Inc. v. Verizon New England Inc., 489 F.3d 13, 21 (1st Cir. 2007) (quoting Continuum Co. v. Incepts, Inc., 873 F.2d 801, 803 (5th Cir. 1989)); Matter of Boat Camden, Inc., 569 F.2d 1072, 1074 (1st Cir. 1978).

Here, the TRO will prevent 3D from terminating the Agreement for a period of time. Ideally, the amount of security would be based on the costs and damages to 3D in not being able to terminate the Agreement immediately (*e.g.*, lost profits from alternative licensing agreements and royalties). When I asked Fairchild's lawyer about the appropriate amount of security, the only monetary amount he could identify was the amount of annual royalties estimated to be at stake in this litigation, about $1 million. Neither in its written papers nor in its

oral argument did 3D request that Fairchild post security or present any evidence of the costs and damages that the TRO will cause it.

Fairchild shall post security in the amount of $330,000. That amount reflects the estimate of annual royalties at stake, and my belief that the preliminary injunction determination should be possible within four months. The amount may be adjusted upon request, if the schedule for the proceedings determined by the Magistrate Judge is materially different.

### TEMPORARY RESTRAINING ORDER

For the reasons stated and upon Fairchild's posting security in the amount of Three Hundred Thirty Thousand Dollars ($330,000), it is hereby **ORDERED** as follows:

    **1.**    The defendant, Third Dimension Semiconductor, Inc., a Texas Corporation, its officers, agents, servants, employees, attorneys, and all those acting in active concert with any of them, are hereby **TEMPORARILY ENJOINED AND RESTRAINED** from terminating the Patent License Agreement by and between Fairchild Semiconductor Corp. (signed January 31, 2001) and Third Dimension (3d) Semiconductor Inc. (assignee of Power Mosfet Technologies, L.L.C.) (signed February 5, 2001).

    **2.**    This Order shall remain in effect until this court renders a decision on plaintiff's request for a preliminary injunction, or otherwise determines that it should be withdrawn.

**SO ORDERED.**

**DATED THIS 8TH DAY OF JULY, 2008**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**