## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| FAIRCHILD SEMICONDUCTOR CORPORATION, | ) ) ) |
| PLAINTIFF | ) ) |
| v. | ) CIVIL No. 08-158-P-H ) |
| THIRD DIMENSION (3D) SEMICONDUCTOR, INC., | ) ) ) |
| DEFENDANT | ) ) |

## DECISION AND ORDER ON MOTIONS TO DISMISS

When two American businesses enter into an agreement concerning their worldwide commerce and specify in their agreement certain forums in which their agreement-related disputes can be heard, should a United States court honor the forum selection clause? The Supreme Court has said that the answer is yes. Does the answer change if the agreement is a worldwide patent license for patents issued by more than one country, and the parties are disputing royalty obligations that depend in part on whether the licensee's products are "covered by" a foreign patent? The answer to that question is more difficult, because a recent Federal Circuit decision, although not involving a forum selection clause, seems vehement that a United States court should almost always decline to hear a dispute about foreign patents, at least if its jurisdiction is discretionary. But in a diversity of citizenship case, which this case is, "*forum non conveniens*" guides the analysis.

It leads me to conclude that the forum selection clause should still be honored, even though the royalty dispute depends in part upon the scope of a Chinese patent. I also conclude that the patentee may not sue for infringement damages while the license remains in effect.

## FACTS ACCORDING TO THE COMPLAINT, THE ATTACHED LICENSE AGREEMENT, AND THE COUNTERCLAIM

Fairchild Semiconductor Corporation's ("Fairchild") principal place of business is in Maine.[1] In February 2001, Fairchild entered a non-exclusive Patent License Agreement ("License Agreement") with Power Mosfet Technologies, L.L.C. ("PMT"), a Texas company.[2] The enumerated licensed patents are two United States patents and two Chinese patents for metal-oxide-semiconductor field-effect transistors ("MOSFETs") and "[a]ll other patent applications on derivative inventions filed in the U.S., China, and any other countries."[3] Fairchild received "a worldwide, non-exclusive, non-assignable, non-divisible personal license under the Licensed Patents to make, have made, use, offer to sell, sell, lease, import support [sic], and otherwise dispose of Licensed Products."[4] PMT covenanted "not to sue or assert any claim for infringement."[5]

Fairchild paid an immediate license fee of $15,000 to PMT.[6] The License Agreement requires Fairchild to pay, in addition, royalties of 4.75 percent on

---

[1] Fairchild Compl. ¶ 2 (Docket Item No. 1).
[2] Id. ¶ 6; License Agreement (Ex. A to Fairchild Compl. (Docket Item No. 1-2)).
[3] License Agreement App. A.
[4] Id. § 2.1.
[5] Id. § 3.
[6] Id. § 4(A)(1).

2

Fairchild products "covered by" "at least one claim" of any of the licensed patents.[7]
On January 31, 2002, PMT assigned the License Agreement to the defendant Third Dimension Semiconductor, Inc. ("3D"), a Texas company whose principal place of business is in Arizona.[8]   3D is now the owner of the licensed patents.

Fairchild has not paid royalties under the License Agreement aside from the initial license fee.  In March 2007, 3D began asserting that Fairchild's SuperFET™ products generate royalties under the License Agreement.[9]   Two patents are involved: U.S. Patent No. 5,216,275 ("the '275 Patent"), and Chinese Patent No. 91,101,845 ("the '845 Patent").  The Eastern District of Texas and the Federal Circuit have construed the U.S. '275 Patent in Power Mosfet Technologies v. Siemens AG.[10]

On April 24, 2008, 3D gave notice to Fairchild that 3D intended to terminate the License Agreement, and threatened to sue Fairchild in Texas and China because Fairchild had not paid royalties nor provided an accounting.[11]  Fairchild then brought this declaratory judgment action in the District of Maine seeking a declaration that it owes no royalties because 3D's patents do not cover Fairchild's SuperFET™ devices, that Fairchild has not infringed any claim of the licensed patents, that Fairchild has not breached the License Agreement, that the license remains in effect and that the License Agreement prevents 3D from suing for

---

[7] Id. §§ 4(A)(2), 1(E), 1(B).
[8] Fairchild Compl. ¶ 11; Assignment of Patent License Agreement (Ex. B to Fairchild Compl. (Docket Item No. 1-3)).
[9] Fairchild Compl. ¶ 12.
[10] 2002 U.S. Dist. Lexis 27560 (E.D. Tex. Sept. 30, 2002), aff'd, 378 F.3d 1396 (Fed. Cir. 2004).
[11] Fairchild Compl. ¶¶ 15-16.

infringement.[12]   According to the License Agreement, for any disputes, "[t]he parties consent to the jurisdiction of the Federal Court for the District of Maine and the Federal Court for the Eastern or Northern Districts of Texas."[13]   3D counterclaimed, claiming breach of the royalty obligation (and related obligations) under the License Agreement, and seeking patent infringement damages for infringing the U.S. '275 patent.[14]   It also sued Fairchild in the Eastern District of Texas on the same subjects as its counterclaim here.

3D has moved for dismissal of, or abstention on, Count 2 in Fairchild's declaratory judgment action.[15]   That is the Count dealing with whether royalties are due on Fairchild products that 3D says are "covered by" the Chinese '845 patent.   3D says that resolving Count 2 will require interpretation of the Chinese patent's scope, and that a United States court has no jurisdiction to do so, or at least should decline to do so.

Fairchild has moved to dismiss 3D's counterclaim (and 3D's claim in the Texas proceeding) for U.S. '275 patent infringement damages on the basis that as long as the license is in effect, Fairchild cannot be held liable for patent infringement damages.[16]

---

[12] Id. at Prayer for Relief.

[13] License Agreement § 5(A).

[14] Third Dimension Semiconductor Inc.'s Original Answer and Counterclaims (Docket Item No. 44).

[15] Third Dimension Semiconductor, Inc.'s Motion to Dismiss Plaintiff's Count II for Declaratory Judgment or in the Alternative, Motion for Abstention (Docket Item No. 47).

[16] Plaintiff's Motion to Dismiss Defendant's Second Counterclaim – Infringement of U.S. Patent No. 5,216,275 (Docket Item No. 54).

On July 8, 2008, I issued a temporary restraining order ("TRO") enjoining 3D from terminating the License Agreement until I could hear the preliminary injunction request.[17]   Thereafter, the Texas case was transferred here and consolidated with this lawsuit.[18]  On November 5, 2008, I heard testimony on the preliminary injunction motion.  I deal with that motion in a separate opinion.

## THE LAW

**A.    3D's U.S. '275 Patent Infringement Counterclaim Here and its Complaint in the Texas Litigation**

Under the License Agreement, Fairchild is licensed to sell products that are covered by the U.S. '275 patent, and 3D has covenanted not to sue or assert any claim for infringement against Fairchild.[19]  Thus, as long as the license is in effect, there can be no infringement of the '275 patent by Fairchild.  Until then, Fairchild may be obliged to pay royalties in accordance with the License Agreement's formula, but not infringement damages.  The License Agreement has not been terminated because, when 3D initiated termination proceedings, I issued a temporary restraining order halting termination.  Fairchild persuaded me that

---

[17] Decision and Order on Motion for Temporary Restraining Order (Docket Item No. 28).  In its most recent filings and during argument at the preliminary injunction hearing, 3D has revealed that after I issued the TRO, it filed a lawsuit in China claiming that Fairchild has infringed the Chinese patent.  I suggested earlier that the TRO would provide Fairchild an affirmative defense to such a lawsuit because, under the license, 3D has covenanted not to sue for infringement and the TRO has prevented 3D from terminating the License Agreement.  Presumably, the Chinese court will have to determine what effect to give to the license covenant not to sue and to my TRO keeping the License Agreement in effect.

[18] Third Dimension Semiconductor Inc. v. Fairchild Semiconductor Corp., No. 08-337-P-H (Oct. 6, 2008); Order Granting without objection Motion to Consolidate (Docket Item No. 10).

[19] License Agreement ¶ 3.

such relief was appropriate based upon the Federal Circuit decision in <u>Cordis Corp. v. Medtronic, Inc.</u> ("<u>Cordis II</u>").[20]

Once I lift that order (if I do), or if it is vacated on appeal, then 3D can complete its license termination proceedings.  Only then can it claim infringement damages from Fairchild's conduct, rather than royalties under the License Agreement.

3D says that its claim for infringement damages is a compulsory counterclaim because Fairchild has asked for a declaratory judgment of non-infringement.[21]  But Federal Rule of Civil Procedure 13 makes compulsory only a claim that the defendant has at the time of service.  Until the License Agreement terminates, 3D has no claim for infringement damages (although it may have a claim for license royalties), and its counterclaim for infringement damages

---

[20] 835 F.2d 859 (Fed. Cir. 1987).  The Supreme Court and the Federal Circuit both have identified a public policy of patent law that overrides the common law of contracts and allows licensees to challenge a covered patent without risking license termination.  <u>Lear v. Adkins</u>, 395 U.S. 653 (1969); <u>C.R. Bard, Inc. v. Schwartz</u>, 716 F.2d 874 (Fed. Cir. 1983).  <u>Lear</u> and <u>Bard</u> involved attacks on patent validity.  But in <u>Cordis II</u>, a licensee that had never paid royalties to the patent holder on particular products over the course of several years (it did pay royalties on other products) was confronted with the patentholder's demand for payment and, if it failed to pay, the threat of license termination and ensuing loss of market share and probable further litigation.  Wanting not to terminate the license agreement, the licensee brought a declaratory judgment action to determine whether the products were covered.  (In <u>Cordis II</u>, it did not challenge patent validity.)  The district court issued a preliminary injunction against the patent holder, preventing it from terminating the license agreement "until the issue of whether the [product] come[s] under the license agreement is resolved."  <u>Cordis Corp. v. Medtronic, Inc.</u>, 2 U.S.P.Q. 2d 1845, 1849 (D. Minn. 1986).  The Federal Circuit affirmed. In issuing the TRO here, I similarly shielded Fairchild from termination until the preliminary injunction hearing.  Contrary to 3D's position at oral argument on the preliminary injunction, the TRO does not contemplate that if it is lifted, 3D can then terminate Fairchild's license retroactively.  Instead, it states:  "3D is correct that the TRO appears to give Fairchild a risk-free ride:  it allows Fairchild to litigate the scope of 3D's patents with only the Agreement's royalties at stake, rather than the damages that would be  owed for patent infringement.  Nevertheless, that is what the Agreement allows and any harm to 3D does not outweigh the potential harm I have described to Fairchild."  Decision and Order on Motion for a Temporary Restraining Order at 7.

[21] Defendant's Response to Plaintiff's Motion to Dismiss Defendant's Second Counterclaim for
*(continued on next page)*

therefore is not compulsory.[22]   Fairchild as licensee is entitled to seek a declaration of non-infringement even while the license is in effect under <u>Cordis II</u> and <u>Medimmune v. Genentech</u>.[23]  That declaratory relief request does not give 3D a right to counterclaim for infringement damages.  I therefore **GRANT** Fairchild's motion to dismiss the counterclaim (as well as Count V—"Second Cause of Action"—in the consolidated Texas complaint[24]) for infringement damages.

**B.**     ***Fairchild's Count 2: Declaratory Judgment Re: Chinese Patent '845***[25]

In Count II, "Declaratory Judgment on Contractual Rights and Obligations," Fairchild requests a declaratory judgment that it owes no royalties with respect to the Chinese '845 patent.[26]  Under the License Agreement, that dispute requires a determination whether the Fairchild products in question are "covered by" (the License Agreement's terminology) one or more of the claims of the '845 patent.[27]  Fairchild asserts that 3D has claimed that Fairchild's Super FET™ devices "would infringe the CN '845 patent but for the Agreement," and Fairchild denies the claim.[28]   3D has moved to dismiss the count for lack of subject matter jurisdiction, for failure to state a claim or, in the alternative, to abstain.  Fairchild

---

Patent Infringement at 6.

[22] Thus, this case is unlike <u>Polymer Industrial Products Co. v. Bridgestone/Firestone, Inc.</u>, 347 F.3d 935 (Fed. Cir. 2003), where the Federal Circuit said that infringement was a compulsory counterclaim to a declaratory judgment action for non-infringement, because in <u>Polymer Industrial Products</u> there was no license agreement.

[23] 549 U.S. 118 (2007).  <u>See</u> <u>also</u> <u>C.R. Bard</u>, 716 F.2d 874.

[24] 3D Compl. (Docket Item No. 138).

[25] Contrary to Fairchild's argument, I conclude that law of the case does not resolve this dispute. It is true that earlier I denied 3D's motion to dismiss this count, but in that ruling I did not deal with these issues that were not fully briefed.

[26] Fairchild Compl. ¶¶ 22-26.

[27] License Agreement §§ 4(A)(2), 1(E), 1(B).

[28] Fairchild Compl. ¶ 23.

argues that subject matter jurisdiction does exist, that abstention is inappropriate because the parties agreed in their License Agreement that this District Court is an appropriate forum for all their license disputes, and that it has stated a proper claim under Federal Rule Civil Procedure 12(b)(6).[29]

Diversity of citizenship confers subject matter jurisdiction over the License Agreement contractual dispute as to whether license royalties are due for any licensed patent, including the Chinese patent.[30] The critical issue is whether I should exercise the jurisdiction in the case of the Chinese patent because doing so may require consideration of Chinese patent law.

### 1.  Enforcement of Forum Selection Clause

The parties agreed explicitly in their License Agreement that the District of Maine could be used to resolve all their license disputes under the Agreement.[31] There is a vigorous line of authority that holds that, when subject matter jurisdiction exists, a federal court should recognize and enforce a consensual choice of forum.  In M/S Bremen v. Zapata,[32] for example, the Supreme Court expressed its strong interest in enforcing forum selection clauses that choose the courts of a particular country "in the light of present-day commercial realities and expanding international trade," unless the resisting party makes a convincing showing that enforcement would "be unreasonable and unjust" or the result of

---

[29] 3D does not separately develop its Rule 12(b)(6) argument.  I treat it therefore as encompassed in its subject matter jurisdiction and abstention analysis and do not treat it separately.  Certainly Fairchild has stated a claim otherwise.
[30] 28 U.S.C. § 1332.
[31] License Agreement § 5(A).
[32] 407 U.S. 1 (1972)

"fraud or overreaching."[33]   Although M/S Bremen was an admiralty case, it has

not been limited to admiralty.[34]  The Restatement of Conflict of Laws (Second) § 80

states:  "The parties' agreement as to the place of the action . . . will be given effect

unless it is unfair or unreasonable."  The First Circuit routinely enforces forum

selection clauses.[35]  The Maine Law Court also recognizes and enforces them.[36]

Under this line of authority, I assume that if a Chinese company and an

American company entered a licensing agreement for U.S. and Chinese patents

and included a forum selection clause that specified Chinese courts as the forum

for their license disputes, and if that agreement was not the product of fraud or

overreaching, or unreasonable or unjust, then as a U.S. district judge I would

enforce the clause.[37]  Indeed, the Federal Circuit has enforced a forum selection

---

[33] M/S Bremen, 407 U.S. at 15.

[34] See, e.g., Burger King v. Rudzewicz, 471 U.S. at 473 n. 14 (1985) ("[P]articularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction.  Where such forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process." (internal quotations omitted)); Monsanto Co. v. McFarling, 302 F.3d 1291 (Fed. Cir. 2002)(court had personal jurisdiction over defendant in patent infringement action based on forum selection clause in technology agreement where clause was not invalid and enforcement was not unjust or unreasonable).

[35] See, e.g., Mercurio v. Wright Medical Technology, Inc., 402 F.3d 62 (1st Cir. 2005)(forum selection clause in a distribution agreement); Silva v. Encyclopedia Britannica, Inc., 239 F.3d 385 (1st Cir. 2001)(forum selection clause in sales contract); Lambert v. Kysar, 983 F.2d 1110 (1st Cir. 1993)(forum selection clause in contract); Royal Bed & Spring Co., Inc., v. Famossul Industria E Comercio de Moveis Ltda., 906 F.2d 45 (1st Cir. 1990)(forum selection clause designating a Brazilian forum).

[36] See, e.g., Genujo Lok Beteiligungs GmbH v. Zorn, 943 A.2d 573 (Me. 2008)("forum selection clause would be meaningless unless it provides courts in Frankfurt am Main with authority to exercise personal jurisdiction over the parties. Therefore, the [Maine Superior] [C]ourt properly concluded that Zorn impliedly agreed to be subject to the jurisdiction of the German courts."). Therefore, like the First Circuit, I need not decide the Erie issue of what law applies in deciding the enforceability of the forum selection clause and whether it is procedural or substantive. Lambert, 983 F.2d at 1116-17 n.10.

[37] 3D points out correctly that the forum selection clause here is permissive, not mandatory, i.e., it does not say that disputes can be heard only in federal court in Maine or Texas. Nevertheless, Fairchild has brought suit in Maine, as 3D agreed it could in the License Agreement. 3D's *(continued on next page)*

clause in a patent case, sending the parties to the courts of Italy to resolve their U.S. patent dispute.[38]  Likewise, the Principles Governing Jurisdiction, Choice of Law, and Judgments in Transnational Disputes § 202 (ALI 2008) ("Principles Governing Jurisdiction") make the case for enforcing forum selection clauses in international intellectual property disputes, including patents.[39]

Fairchild says that the forum selection clause in this License Agreement controls because this is a contract dispute under the License Agreement.  3D, on the other hand, says that the parties are engaged in a dispute about patent infringement because the license permits what otherwise would be infringing activities under a Chinese patent. 3D argues that, notwithstanding the forum selection clause, I should find that I lack subject matter jurisdiction or at least

argument that I should decline jurisdiction with respect to the Chinese patent therefore requires me to decide whether the parties' forum agreement approving the Maine forum should be respected.  I do not ignore it just because it is permissive. See, e.g., JFE Steel Corp. v. ICI Americas, Inc., 2008 WL 4449080 (N.D. Ohio 2008); Haagen-Dazs Shoppe Co., Inc., v. Born, 897 F. Supp. 122 (S.D.N.Y. 1995); Cambridge Nutrition A.G. v. Fotheringham, 840 F. Supp. 299 (S.D.N.Y. 1994).

[38] Warner & Swasey Co. v. Salvagnini Transferica S.P.A., 806 F.2d 1045 (Fed. Cir. 1986), aff'g 633 F. Supp. 1209 (W.D.N.Y. 1986).  The Federal Circuit says that a forum selection clause "is enforceable unless the party challenging it clearly demonstrates that it is invalid or that enforcement would be unreasonable and unjust."  Monsanto Co., 302 F.3d at 1294 (not an international case)(citing M/S Bremen and Burger King).

[39] The Principles do so, even recognizing the argument by some that these issues are too technical for courts of general jurisdiction.  Principles Governing Jurisdiction § 102 comment c and § 103 comment b.  A new Hague Convention on Choice of Court Conventions has been drafted and is ready for ratification.  It too would recognize choice of forum clauses for patent royalty disputes, and would not permit a chosen court to decline a case on *forum non conveniens* reasoning.  The Hague Convention on Choice of Court Agreements art. 5, June 30, 2005.  Like the Principles Governing Jurisdiction, the Hague Convention would not endorse foreign jurisdiction over patent *validity* disputes.  Id. art. 2 § 2(n); Principles Governing Jurisdiction §§ 213, 302; see also Stein Associates Inc. v. Heat & Control Inc., 748 F.2d 653, 658 (Fed Cir. 1984) (where infringement depends upon validity, "[o]nly a British court, applying British law, can determine validity and infringement of British patents"). See also Marta Pertegás Sender, Cross-Border Enforcement of Patent Rights (2002) §§ 4.88-89 (discussing this distinction as drawn in Belgian decisions) and § 6.13 (questioning the limitation in the context of infringement claims). Fairchild has not challenged the validity of the Chinese patent in this lawsuit. In fact, the License Agreement refers to validity *(continued on next page)*

abstain from exercising it, based upon recent Federal Circuit decisions in foreign patent infringement cases culminating in <u>Voda v. Cordis Corp.</u>[40] I turn to those cases.

> **2.     *A United States Court's  Authority to Deal with Foreign Patents***

When a federal court has subject matter jurisdiction over some claims in a lawsuit, the supplemental jurisdiction statute[41] allows it to exercise (with some exceptions) discretionary jurisdiction over related claims that otherwise would not be within the court's subject matter jurisdiction.  In <u>Voda</u>, the Federal Circuit made clear that it is almost always an abuse of discretion to use that supplemental power to deal with infringement claims involving foreign patents.[42] The Federal Circuit expressed concerns that:

- ruling on validity and infringement of a foreign patent could undermine United States obligations under intellectual property treaties;[43]

- comity and relations between sovereigns ordinarily counsel United States judicial deference to foreign courts for infringement claims concerning foreign patents: because there is no international duty to adjudicate them, no convenience in using U.S. courts to do so, no

---

being determined "by a court of competent jurisdiction from which no further appeal can be taken," § 4.E, a different provision than the forum selection clause of § 5.A.
[40] 476 F.3d 887 (Fed. Cir. 2007).
[41] 28 U.S.C. § 1367.
[42] <u>Voda</u> actually held that, because § 1367(c) speaks in terms of discretion, a district court must review each case individually. 476 F.3d at 905.  But a fair reading of <u>Voda</u> suggests that the Federal Circuit expects supplemental jurisdiction to be declined over foreign patents in all but the rarest of cases.
[43] <u>Voda</u>, 476 F.3d at 900.

reason that a foreign forum cannot adequately protect foreign patent rights, and possible prejudice to the rights of foreign governments; because patent infringement disputes like land disputes should be decided locally; and because the supplemental jurisdiction statute is ambiguous on the jurisdictional grant;[44]

- although multinational patent adjudication could be efficient, judicial economy calls for avoiding difficult foreign patent questions in the absence of a mechanism for recognizing resulting foreign judgments;[45]

- convenience, such as that recognized in *forum non conveniens* analysis, counsels against dealing with foreign patents (although Voda noted that the district court there had not assessed that factor and that the plaintiff's choice of forum could be a factor supporting jurisdiction);[46] and

- it would be unfair for a U.S. court to undertake infringement decisions when the "act of state" doctrine, preventing U.S. courts from inquiring into another sovereign's official acts, would prevent that court from determining the validity of the foreign patent grants in question.[47]

---

[44] Id. at 900-02.
[45] Id. at 903.
[46] Id. at 903-04.
[47] Id. at 904.  Voda did not overrule (or even refer to) Warner & Swasey.  At least one of Voda's statements, however, seems inconsistent with the outcome of Warner & Swasey (sending a U.S. patent dispute to the courts of Italy): "Foreign courts exercising jurisdiction over claims based on *(continued on next page)*

In this lawsuit, however, diversity of citizenship,[48] not supplemental jurisdiction, affords the basis for federal jurisdiction over the License Agreement claims relating to the Chinese patent.[49]  The Federal Circuit referred to the possibility that diversity jurisdiction might exist in Voda, but it explicitly refused to consider its consequences.[50]  Unlike supplemental jurisdiction, diversity subject matter jurisdiction ordinarily is not discretionary.[51]

Nevertheless, the Supreme Court and the Federal Circuit[52] both have recognized that sometimes a federal court with subject matter jurisdiction should refrain from exercising that jurisdiction because the forum is not convenient ("*forum non conveniens*" doctrine).[53]  In Piper Aircraft Co. v. Reyno[54] the Supreme

---

U.S. patents would destroy Congress's intent to foster uniformity and to preclude forum shopping." Id. at 903.

[48] 28 U.S.C. § 1332.

[49] The Federal Circuit has determined that the federal patent jurisdiction statute, 28 U.S.C. § 1338, does not extend to foreign patents.  Mars Inc. v. Kabushiki-Kaisha Nippon Conlux, 24 F.3d 1368, 1373-74 (Fed. Cir. 1994). Thus, here there is § 1338 jurisdiction over the U.S. '275 patent license dispute, see U.S. Valves v. Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000); accord Univ. of Texas Sys. v. Nippon Telephone & Telegraph Corp., 414 F.3d 1358 (Fed. Cir. 2005), but not over the Chinese '845 patent license dispute and, under Voda, no § 1367 supplemental jurisdiction over the latter.

[50] Voda, 476 U.S. at 905.

[51] See, e.g., Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 15 (1983) ("the federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them") (internal quotation omitted); Baker-Bauman v. Walker, 2007 WL 1026436 (S.D. Ohio 2007) ("fanciful to argue that [Voda] establishes the proposition that District courts cannot exercise diversity jurisdiction over patent infringement actions based upon foreign patents").

[52] There is some uncertainty over whether Federal Circuit law or regional circuit law applies to *forum non conveniens* analysis in a patent case.  See Ideal Instruments, Inc. v. Rivard Instruments, Inc., 434 F. Supp. 2d 598, 634 (N.D. Iowa 2006) (regional circuit law governs). Here, for example, if the lawsuit involved solely the Chinese patent and if jurisdiction were based upon diversity of citizenship, an appeal might lie to the First Circuit, not the Federal Circuit. In any event, the parties have not argued that there is any material difference between First Circuit and Federal Circuit law for purposes of this dispute.

[53] According to the briefs on file at the Federal Circuit, that is the position that the United States (U.S. Patent & Trademark Office and U.S. Dept. Of Justice, Civil Division) took in its amicus brief in Voda.  Brief for the United States as Amicus Curiae in Support of the Appellant, Voda, 476 F.3d 887, 2005 WL 1868615 (Fed. Cir. Jun. 15, 2005) (No. 05-1238).  The United States suggested that diversity jurisdiction existed in Voda, but that the district court should dismiss on the basis of *forum non conveniens*.  Brief for the United States as Amicus Curiae in Support of the Appellant, *(continued on next page)*

Court held that a United States court with diversity jurisdiction could "in the exercise of its sound discretion" dismiss a lawsuit on the basis that it should more properly be brought in a court in Scotland.  To "guide trial court discretion," the Supreme Court in <u>Piper Aircraft</u> identified "'private interest factors' affecting the convenience of the litigants, and . . . 'public interest factors' affecting the convenience of the forum" (factors that it took from the earlier cases of <u>Gulf Oil v. Gilbert</u>[55] and <u>Koster v. Lumbermens Mut. Cas. Co.</u>[56]):

> "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive" [private interest factors] administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty [public interest factors].[57]

---

<u>Voda</u>, 476 F.3d 887, 2005 WL 1868615, **14-17 (Fed. Cir. Jun. 15, 2005) (No. 05-1238).  It also observed that "[t]he forum non conveniens doctrine is a flexible one, and the Supreme Court has cautioned against encumbering it with rigid rules that divest district courts of discretion.  It would therefore be inappropriate to adopt a categorical rule that *forum non conveniens* principles compel the dismissal of foreign patent infringement claims in every case."  <u>Id</u>. at 17.  <u>Accord</u> Eric Chan, <u>Asserting Foreign Patent Claims in U.S. Federal Courts: What's Left After Voda v. Cordis?</u>, 18 Alb. L.J. Sci. & Tech. 1, 31-32, 45 (2008).  The United States concluded, however, that "[o]nly in the exceptional case are countervailing considerations likely to warrant adjudicating a foreign infringement claim in this country's courts."  Brief for the United States as Amicus Curiae in Support of the Appellant, <u>Voda</u>, 476 F.3d 887, 2005 WL 1868615, *17 (Fed. Cir. Jun. 15, 2005) (No. 05-1238).
[54] 454 U.S. 235, 241 (1981).
[55] 330 U.S. 501, 508-09 (1947).
[56] 330 U.S. 518, 524 (1947).
[57] 454 U.S. at 241 n.6 (quoting <u>Gilbert</u>, 330 U.S. at 508 and 509).

_Piper Aircraft_ recognized that "[t]he _forum non conveniens_ determination is committed to the sound discretion of the trial court."[58]  "[T]he central focus of the _forum non conven_iens inquiry is convenience," and "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice."[59]  But the key is "flexibility" and there should be no "rigid rule."[60]

Here, there is no heavy burden on 3D or the court, no suggestion of difficult access to sources of proof, no witness difficulties, no need for a view, and no issues of court congestion. Fairchild's reason for choosing the Maine forum is apparent:  Fairchild's principal place of business is here and the forum selection clause identifies the Maine forum.  That is the "local interest" here for these two American companies.   There is certainly no unfairness in burdening Maine citizens with jury duty over a dispute involving a business headquartered and employing people in Maine.  _Piper Aircraft_ stated that _forum non conveniens_ is "designed in part to help courts avoid conducting complex exercises in comparative law. . . . [T]he public interest factors point towards dismissal where the court would be required to 'untangle problems in conflict of laws, and in law foreign to itself.'"[61]  But here, there are no conflict of law issues; there _is_ the difficulty of translating and identifying Chinese law, not a small challenge, but no

[58] _Id_. at 257.
[59] _Id_. at 249.
[60] _Id_.
[61] _Id_. at 251 (quoting _Gilbert_, 330 U.S. at 509).

15

suggestion that there are Chinese law problems for this U.S. court to "untangle." Moreover, there is no single forum that will be "at home with" all the law that must apply to this dispute; this forum is as good as any other choice to resolve the entire controversy between Fairchild and 3D.   Piper Aircraft also noted that a plaintiff's choice of forum is entitled to greater deference when the plaintiff, like Fairchild here, has chosen the home forum.[62]   The preceding Gilbert decision, upon which Piper Aircraft drew, made clear that "[*forum non conveniens*] doctrine furnishes criteria for *choice between* [two forums]."[63]   According to the First Circuit, "a party moving for dismissal bears the burden of establishing that (1) there is an adequate alternative forum, and (2) that considerations of convenience and judicial efficiency strongly favor litigating the claim in the second forum."[64] Applying those factors, I cannot conclude that the Chinese forum is preferable for resolving this entire license royalty dispute.

But in Mars Inc. v. Kabushiki-Kaisha Nippon Conlux,[65]in dismissing a case involving a foreign patent claim for lack of subject matter jurisdiction under supplemental jurisdiction, the Federal Circuit said that it would be fruitless for the plaintiff there to assert diversity jurisdiction on remand.  That case had no license agreement and thus no forum selection clause. Explaining why diversity jurisdiction would be fruitless, the Federal Circuit said that under *forum non conveniens* principles, the "public interest" factors to consider "include the local

---

[62] Id. at 255.
[63] 330 U.S. at 507(emphasis added).
[64] Mercier v. Sheraton International, Inc., 935 F.2d 419, 423-24(1st Cir. 1991)(citation omitted).
[65] 24 F.3d 1368 (Fed. Cir. 1994).

interest in having localized controversies decided at home; the interest in having the trial . . . in a forum that is at home with the law that must govern the action; [and] the avoidance of unnecessary problems in conflict of laws, or in application of foreign laws."[66]  In <u>Mars</u>, without a forum selection clause, the Federal Circuit said that those factors would require dismissal of even a diversity case.  I turn, therefore, to consider the forum selection clause along with the Federal Circuit foreign patent cases and the Supreme Court *forum non conveniens* principles.

### 3.      *Applying the Divergent Precedents*

Fairchild says that this is a License Agreement dispute and that the forum selection clause cases govern.  3D says that this is a foreign patent infringement dispute and that the <u>Mars</u>/<u>Voda</u> cases govern.  There is some truth to both parties' assertions about the nature of their dispute, but Fairchild has the better argument.   3D is correct that parts of the contractual dispute bear upon infringement, because royalties are due under the License Agreement only if Fairchild's products are "covered by" one or more claims of the two patents.[67] But the dispute remains primarily one of contractual interpretation.[68]  At the TRO hearing, 3D asserted four separate breaches of the License Agreement by Fairchild: failure to pay royalties, failure to satisfy the annual reporting obligation,

---

[66] 24 F.3d at 1376 (internal quotations omitted).

[67] In other words, if they would otherwise infringe, royalties are due. In <u>U.S. Valves</u>, 212 F.3d at 1372, the Federal Circuit said that in determining whether products are "covered by the licensed patents," a court "must interpret the patents" and determine whether there is infringement. According to Count II of the Complaint, Fairchild "intends to present evidence demonstrating that, in accordance with Chinese law and for reasons similar to those regarding the corresponding '275 [U.S.] patent, its SuperFET™ devices do not infringe the CN[Chinese] '845 patent."   Fairchild Complaint ¶ 23.

[68] <u>See</u> <u>Eclipse Bicycle Co. v. Farrow</u>, 199 U.S. 581 (1905).

failure to provide the required audit upon 3D's request, and commencement of litigation against 3D for a declaration of non-infringement before the Agreement had been terminated.[69]  If royalties are due under the License Agreement, their amount will be determined by the "Net Sales Billed," a contractual term whose calculation depends on the volume of Fairchild sales.[70]  The Agreement defines "Net Sales Billed" as the "total amount billed in any country of the world" by Fairchild or its subsidiaries concerning "Licensed Products."[71]  The Agreement defines "Licensed Products" as products "that are covered by . . . at least one claim of one or more of the Licensed Patents."[72]  These are all contractual terms, whose meaning under the choice of law clause is to be determined according to United States domestic law.[73]  Given 3D's expressed desire to terminate the License Agreement, the lawsuit probably will also require interpretation of the contractual terms laying out procedures for and justifications for terminating the License Agreement.  Since this lawsuit will involve all these contractual issues and since two American businesses voluntarily decided that their disputes under their License Agreement could be interpreted and enforced in the District of Maine or the Northern or Eastern District of Texas, I believe that <u>M/S Bremen</u> and <u>Warner & Swasey</u> furnish strong grounds for enforcing their agreement about the forum, and that <u>Piper Aircraft</u> is not to the contrary.

---

[69] Decision and Order on Motion for Temporary Restraining Order n.4.
[70] License Agreement § 1(E).
[71] <u>Id</u>.
[72] <u>Id</u>. § 1(B).
[73] In <u>U.S. Valves</u>, 212 F.3d at 1373, a case involving a patent license agreement, the Federal Circuit said:  "This court applies the law of the applicable state in evaluating damages for breach of *(continued on next page)*

Nevertheless, I assess the Mars and Voda factors, since they are more recent Federal Circuit cases (albeit not involving forum selection clauses) and certainly exhibit a strong Federal Circuit distaste for letting United States courts deal with foreign patents.[74]

In this case, the Mars factors are evenly balanced. The "local interest in having controversies decided at home" could mean United States jurisdiction for these two American companies who entered into this License Agreement providing for royalties, or it could mean jurisdiction in China to determine whether the Fairchild product is covered by a claim of the Chinese patent.[75] The "interest in having the trial . . . in a forum that is at home with the law that must govern the action" implicates U.S. jurisdiction for the U.S. patent issue, and a Chinese court for the Chinese patent scope and interpretation.[76] But both courts would then have to deal with the meaning of the License Agreement, an agreement entered

---

contract, a state claim of action."

[74] Warner & Swasey preceded Mars and Voda, although it was decided two years later than Stein.

[75] Mars, 24 F.3d at 1376 (internal quotations omitted).

[76] Id. Both parties agree, as they must, that Chinese law governs the scope and interpretation of the Chinese patent claims, just as United States law governs the scope and interpretation of the U.S. patent claims. To the extent that the choice-of-law clause of § 5.A could be read to state otherwise, it is unenforceable and subject to being severed under § 14 of the License Agreement. In any event, the choice-of-law clause does not affect the choice-of-forum clause, which follows it in the agreement. The choice-of-law clause (which I reproduce below) can also be read more narrowly, as referring only to the contractual interpretation itself, not patent law issues:

> This Agreement is to be construed in accordance with and governed by the internal laws of either the State of Maine or the State of Texas according to the choice of a party seeking redress for any dispute arising under this Agreement, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Maine or the State of Texas.

License Agreement § 5(A).

19

into in the United States and under United States domestic (state) law.[77]  The "avoidance of unnecessary problems in conflict of laws, or in application of foreign laws" is not achievable in this case.[78]  Although conflict of laws is not an issue, whether the jurisdiction is China or the United States there will be foreign law issues in one court or the other.

As for Voda,

- the Act of State doctrine is not implicated, because there is no challenge to the Chinese patent's validity; it is therefore not unfair to deal with the patent issue (as it might have been if validity were challenged and could not be addressed).[79]

- No treaty problems have been called to my attention that result from enforcing a consensual licensing agreement between these two American companies, including their voluntary choice of forum. Although determining whether Fairchild products are "covered by" the Chinese patent bears upon infringement questions, there need not be any declaration of infringement or non-infringement, only a decision whether Fairchild products are "covered by" the Chinese '845 patent. This is not "the U.S. judiciary . . . unilaterally decid[ing] either for our government or for other foreign sovereigns that our

---

[77] At oral argument, 3D's lawyer told me that in China 3D has asked only for a declaration of infringement, not damages, but that the Chinese court is free to award infringement damages on its own, notwithstanding the License Agreement.  Thus, the Chinese court will have to consider enforceability of the contractual covenant not to sue, a domestic United States law issue.

[78] Mars, 24 F.3d at 1376 (internal quotations omitted).

[79] Voda, 476 F.3d at 904.

courts will become the adjudicating body for any foreign patent . . . ."[80]  Instead, this is a choice made by private parties about how and where to resolve their royalty disputes efficiently.  In fact, nothing in the License Agreement or its forum selection clause prevents a party from choosing a Chinese court.  They simply agreed that if one party chooses a Texas or Maine federal court, that forum may proceed.[81]

- On <u>Voda</u>'s comity and sovereign relations concerns, although there is no international duty for a U.S. court to adjudicate the Chinese patent, the parties in the License Agreement have provided for U.S. adjudication of their royalty disputes, and they have thereby determined in their contract that an American forum is convenient, and they have chosen the American forums as the place where they prefer to protect their rights.  If there is concern that this court's decision somehow could "prejudice the rights of the foreign governments,"[82] it can be made clear that this court's decision is limited solely to license scope and interpretation and is not intended

---

[80] <u>Id</u>. at 900.

[81] This observation may turn out to be important. As I recounted in note 17 above, 3D's lawyer asserted at oral argument that, notwithstanding the license covenant not to sue, 3D has sued Fairchild in China over the Chinese patent '845 and that the Chinese court will proceed to trial in January 2009, before the lawsuit in this court reaches the trial stage.  Possibly, therefore, there will be a Chinese judgment to inform this court on the Chinese patent law issue before I must decide it (unless the Chinese court enforces the License Agreement's covenant not to sue).  At oral argument 3D asked me in effect to sever the dispute over whether Fairchild's products are "covered by" the Chinese '845 patent, direct the parties to China to litigate that issue, and reserve decision on the rest of the License Agreement dispute until I receive the China court's answer.  3D provided no authority for breaking up the lawsuit in that fashion, and I see no reason to do so.

to be determinative of any later infringement issue between these or other parties.  As for the local action doctrine, Fairchild products seem to be in worldwide commerce, but the dispute is between two United States companies over an agreement that they entered in the United States.

- On judicial economy, <u>Voda</u> identified the extra burden of applying foreign law, the need for separate jury trials for the foreign claims, and the absence of any enforcement authority for a domestic judgment concerning a foreign patent.  Certainly the foreign law burden is present here.  There are translation issues concerning the Chinese patent, and there are the complexities of Chinese patent law. But there is little likelihood of separate jury trials.  These patents are related, and any differences can be handled in the jury instructions to a single jury.  As for enforcement, the parties have a contract about licensing these patents and where their disputes should be heard.  Whether this court's decision ultimately is that royalties are due, or that they are not due, I will not be asking any other court to enforce it.  This court can enforce the royalty payments between these two companies or decide that none is due, without making any binding judgment over what infringes a Chinese patent.

---

[82] <u>Voda</u>, 476 F.3d at 901.

- The convenience factors are strongly in favor of enforcing the forum selection clause.[83]   Primarily I am being asked to interpret an agreement that the parties entered voluntarily, presumably because it was in both their interests as American companies to be able to resolve their licensing disputes in American courts, notwithstanding their knowledge that they were licensing both U.S. and Chinese patents.[84]   (Warner & Swasey shows that the Federal Circuit would honor an agreement's choice of a Chinese forum for a U.S. patent dispute.)   That advance consensual private determination of where disputes can best be handled resolves an important element of the *forum non conveniens* analysis, namely, private convenience.[85]  While I may have to examine the scope of the Chinese patent[86] to determine what, if any royalties are due, that is a collateral consequence of the License Agreement.   Of course, it will be challenging to deal with foreign law and translations,[87] but that has never been a sufficient

---

[83] The only two concerns that Voda mentioned here were the costs of obtaining expert evidence in foreign patent law under Fed. R. Civ. P. 44.1 and the plaintiff's choice of forum.  476 F.3d at 904. The parties have already chosen to obtain such expert evidence for their own purposes, although admittedly there may be increased expense as the matter proceeds to trial.  The other factor, the plaintiff's choice of forum, counts in favor of United States jurisdiction.

[84] I observe that in the context of personal jurisdiction, the Federal Circuit has recognized that a state has "a substantial interest in protecting its residents from claims of patent infringement that may be unwarranted, and in enforcing patent license agreements into which its residents have entered." Deprenyl Animal Health, Inc. v. University of Toronto Innovations Fdn., 297 F.3d 1343, 1356 (Fed. Cir. 2002).  The Deprenyl Animal Health court also recognized that foreign courts (there Canada) can properly apply United States patent law.  Id.

[85] The importance of enforcing private agreements on forum selection may be particularly significant where one party, here the patentee, can assign its interest without the consent of the other party (here the licensee) and thereby introduce a new partner into the relationship.

[86] But see supra note 81.

[87] 3D's expert, Jie Sha, has stated by affidavit that "the differences between Chinese and U.S. *(continued on next page)*

23

reason to decline jurisdiction,[88] and the Federal Rules of Civil Procedure explicitly contemplate entertaining foreign law.[89]

- Deference to foreign courts cuts in both directions. Just as I must consider the Chinese court's role, the court in China will also have to consider this court's role, since the parties agreed on an American forum, the parties agreed to a license that prevents suing for infringement as long as the license is in effect, and this court issued a

---

patent laws present insurmountable challenges for a U.S. practitioner [and presumably judge] tasked with understanding the scope of protection for CN '845 and Fairchild's infringement under the Chinese patent law." Report of Jie Sha (attached as Exh. D to 3D's Pre-Hearing Brief in Opposition to Fairchild's Request for Preliminary Injunction (Docket Item No. 72)). That expert, however, has been licensed as a Chinese patent attorney since 1985, registered to practice before the United States Patent and Trademark Office and licensed to practice law in Illinois. Id. at 1. He is a partner at a law firm (Liu, Shen & Associates) that is located in Beijing and Chicago. Id. He holds a J.D. and LL.M. from John Marshall Law School and Chinese legal training from the University of Politics and Law of China. Id. at 1-2. Since 1985 he has prosecuted over 2000 patents in both the United States and China. Id. at 2. And since 1989 his practice has included patent litigation in both countries. Id. He seems to be comfortable testifying about both American and Chinese patent law, and I see no reason why a United States judge cannot depend on such experts. (Fairchild also has an expert with dual credentials.) Ironically, 3D's principal, Samuel Anderson, who testified at the preliminary injunction hearing, said that he had never read the Chinese patent nor obtained a translation of it. Yet 3D and Fairchild entered an agreement for royalties payable under it. The end result of 3D's argument seems to be the conclusion that neither party knew (or could know) what they were licensing, and only the Chinese authorities can tell us what these two American companies did when they signed the license agreement (or in 3D's case accepted the assignment from PMT).

[88] See, e.g., Manu Int'l S.A. v. Avon Products, Inc., 641 F.2d 62, 67 (2d Cir. 1981)("we must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform," referring there to Taiwanese law). United States patent law contemplates some involvement of foreign law and patents. See 35 U.S.C. § 119(a) (allowing an earlier effective date if, in a foreign country, an "application for patent for the same invention" was filed within the preceding 12 months.); § 119(b)(3) (requiring, if requested, a translation of the foreign application, specification and drawings upon which it is based.) Indeed, 3D's U.S. '275 patent lists the China '845 patent as providing a priority date for the '275 patent. See Power Mosfet Tech., 2002 U.S. Dist. Lexis 27560, *17; see also Fairchild Compl. ¶ 7. In addition, § 102(d) requires assessment of whether the invention "was first patented . . . in a foreign country" more than one year before the U.S. patent application. See In re Monks, 588 F.2d 308 (C.C.P.A. 1978)(examining British law on when a patent is issued).

[89] Fed. R. Civ. P. 44.1.

TRO preventing termination of the license at a time before the Chinese court ever became involved.

I conclude that the concerns expressed in <u>Voda</u> do not prevent enforcement of the forum selection clause for this royalty dispute.

I have analyzed 3D's motion under *forum non conveniens* doctrine, which is what the Federal Circuit did in <u>Mars</u> when discussing diversity jurisdiction. (I have also applied the principles of the recent <u>Voda</u> decision.)  3D argues that I should *abstain,* because of the act of state doctrine and international comity.  But the result is the same, for the reasons that I have given in discussing those two factors under the other rubric.  According to the Supreme Court, abstention "is the exception, not the rule . . . an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" and any balancing of the factors must be "heavily weighted in favor of the exercise of jurisdiction."[90]

## CONCLUSION

3D says that no U.S. court has ever interpreted a foreign patent.  I do not know if that assertion is correct, and I do not yet know if I will have to do so here.  If I do, it will be solely in the process of deciding whether Fairchild SuperFET™ products are "covered by" 3D's Chinese patent under the parties' License Agreement. I do know that the Federal Circuit has enforced a forum selection

---

[90] <u>Moses  H. Cone</u>, 460 U.S. at 14-16 (internal quotations and citations omitted).

clause to permit an Italian court to interpret a United States patent[91] and that commentators have pointed to foreign court cases that have dealt with United States patent law.[92]

In a globalized marketplace, intellectual property disputes can involve many countries' patent laws.[93]  Uncertainty and complexity in resolving those disputes can increase the cost of doing business and, as a result, the cost to the consumer.[94]  Private agreement that chooses in advance the forum that will be most convenient to the negotiating parties for resolving their later disputes seems a useful antidote where possible (recognizing that challenges to the official acts of officialdom, as in challenges to patent validity, may have to be reserved to the courts of the issuing country). [95]  According to M/S Bremen:  "The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting."[96]  Agreement on forum should not be considered an affront to any particular nation's courts, particularly when there is no challenge to patent

---

[91] Warner & Swasey, 806 F.2d 1045.

[92] See, e.g., Chan, supra note 53, at 45-46, 39 (citing the Japanese case of K.K. Coral Corp. v. Marine Bio K.K., Case No. 1943 (wa)/2002 (Tokyo District Count, Oct. 16, 2003), and the English case of Celltech Chiroscience Ltd. v. Medimmune, [2002] EWHC 2167 (Pat) 1008, [1], [4], [8] (Eng.).  I do not know whether they involved forum selection clauses.

[93] Sender, supra note 39, at vii (patent litigants seeking consideration of their multinational disputes since the end of the 1980s); id. at 2 (common for alleged infringement by same competitor in several countries); id. at 81.

[94] "State-by-State adjudication may make the choice-of-court and choice-of-law issues appear easier to resolve, but multiple adjudication could produce uncertainty, inconsistency, delay, and expense.  Moreover, multiple suits involving the same claims and incidents strain judicial dockets." Principles Governing Jurisdiction, Introduction at p. 4.  Those observations apply here.

[95] "The private sector is also finding its own global solutions through mergers among intellectual property holders, the creation of patent pools and standard-setting organizations, and *resort to arbitration as well as choice-of-law and choice-of-court clauses*." Principles Governing Jurisdiction, Introduction at p. 5 (emphasis added).

validity and thus to the actions of a foreign patent office authority.  Indeed, if parties *cannot* reliably select in advance the judicial forum for such disputes about royalty obligations, international arbitration (wholly shielded from public view) will be the preferred alternative that private parties elect.   (It is unlikely that arbitrators will reject the cases on grounds of complexity or difficulty.[97])  If there truly is concern that somehow enforcing forum selection clauses in a patent royalty dispute will impinge on one or another nation's sovereignty, then the consequences of the judicial decree in such a case can be limited explicitly to the contracting parties and no others.  But it should not be that parties to a license are prohibited from agreeing on steps to achieve an efficient resolution of royalty disputes that may later arise.  Yes, even domestic patent law is difficult, and it is challenging to resolve disputes between the parties over the proper translation of the foreign patent claims, and disputes about how the foreign law applies to the dispute, and learning about foreign patent law and procedure.  While I recognize these difficulties, law and language often are difficult and they are familiar challenges for a federal judge in today's world.  Such difficulties are a necessary part of deciding whether an international contract has been breached and, if so, what the damages are for that breach.[98]  Given the reasons for enforcing a forum selection clause, they are hardly obligations for a court to shirk.

---

[96] 407 U.S. at 13.

[97] Arbitration does have the advantage that an arbitrator could be chosen with foreign language skills and/or foreign law subject matter expertise, unlike a general jurisdiction judge.

[98] Sender, <u>supra</u> note 39, at 27 (discussing German and Dutch courts' rejection of the complexity argument).

At the end of the day, this is a contractual dispute between two American companies licensing semiconductor technology, who voluntarily chose United States courts for their license disputes. Their choice of forum should be honored.

Accordingly, 3D's motion to dismiss Count 2 of the Complaint is **DENIED**. Fairchild's motion to dismiss Count 2 of the counterclaim (and Count V— "Second Cause of Action"—of the transferred Texas complaint) is **GRANTED**.

**SO ORDERED.**

**DATED THIS 10TH DAY OF DECEMBER, 2008**

/S/D. BROCK HORNBY
**D. BROCK HORNBY
UNITED STATES DISTRICT JUDGE**

28