## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *FAIRCHILD SEMICONDUCTOR CORPORATION,* | ) ) ) | |
| *Plaintiff* | ) ) | |
| *v.* | ) ) | *Civil No. 08-158-P-H* |
| *THIRD DIMENSION SEMICONDUCTOR, INC.,* | ) ) ) | *REDACTED VERSION[1]* |
| *Defendant* | ) ) | |

### AMENDED MEMORANDUM DECISION AND ORDER ON PLAINTIFF'S MOTIONS FOR SANCTIONS AND TO STRIKE AND DEFENDANT'S MOTIONS FOR ATTORNEY FEES, TO AMEND SCHEDULING ORDER, AND FOR RULE 56(F) CONTINUANCE[2]

Plaintiff Fairchild Semiconductor Corporation ("Fairchild") moves to modify the confidentiality order entered in this case on the basis of the perceived substantial risk of misuse of its so-called "Highly Confidential" information posed by the asserted "competitive decisionmaker" status of defendant Third Dimension Semiconductor, Inc.'s ("3D's") lead trial counsel, Michael Shore of Shore Chan Bragalone LLP ("SCB"). *See* Consented to Confidentiality Order ("Confidentiality Order") (Docket No. 50); Plaintiff's Motion for Sanctions Including Enforcement

---

[1] This version of my decision has been redacted in accordance with my Order on Defendant's Request for Redactions of Decision of even date herewith. An unredacted version previously was filed under seal.

[2] The amendments to this decision and order are found on page 35 where a reference to the first and second RFPs in the paragraph numbered 1 has been corrected to refer to the second and third RFPs and where deadline dates have been adjusted to correspond to the date of this amended decision and order.

and Modification of the Confidentiality Order ("Motion for Sanctions") (Docket No. 194) at 15-16; Plaintiff's Reply in Support of Its Motion for Sanctions Including Enforcement and Modification of the Confidentiality Order ("Sanctions Reply") (Docket No. 255) at 1-7.[3]  Fairchild seeks modification of the Confidentiality Order, *inter alia*, to direct SCB to return all documents designated "Highly Confidential" and to bar that firm's further access to such documents unless it can show cause why particular Highly Confidential documents are essential for its presentation at trial on the merits.  *See* Motion for Sanctions at 20-21.

In related motions, 3D seeks to amend the scheduling order and to extend its deadline for responding to a pending summary judgment motion primarily on the basis that Fairchild has refused to produce requested documents relating to so-called SupreMOS parts pending resolution of the Motion for Sanctions.  *See* Third Dimension Semiconductor, Inc.'s Motion To Modify/Amend the Scheduling Order, Extend Discovery, and Continue the Trial ("Motion To Amend") (Docket No. 210) at 1-4; Third Dimension Semiconductor, Inc.'s Expedited Motion for Continuance Pursuant to Federal Rule of Civil Procedure 56(f) To Respond to Fairchild Semiconductor, Inc.'s Motion for Summary Judgment ("Rule 56(f) Motion") (Docket No. 252) at 1-6.[4]  Fairchild also seeks to strike a declaration of Shore attached to 3D's surreply in support of its opposition to the Motion for

---

[3] Fairchild initially also sought sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2) for Shore's and SCB's alleged misuse of Fairchild's confidential information in violation of the Confidentiality Order.  *See* Motion for Sanctions at 1-2, 18-20.  At a telephonic hearing held on April 9, 2009, Fairchild's counsel clarified that his client accepted at face value the declarations under oath of SCB counsel that no such misuse occurred, and therefore no longer pressed that point.  *See* Transcript of Proceedings ("Hearing Transcript") (Docket No. 280) at 14, 45.

[4] Fairchild filed its motion for summary judgment on March 16, 2009.  *See* Docket No. 216.  After the Rule 56(f) Motion was filed on March 31, I protected 3D from having to file a response, which otherwise would have been due on April 6. *See* ECF Docket (entry of April 1, 2009).

Sanctions.  *See* Plaintiff's Motion To Strike Declaration of Michael W. Shore ("Motion To Strike") (Docket No. 277).

With the benefit of documentary evidence submitted by both sides with respect to all three substantive motions and a two-hour telephonic hearing held on April 9, 2009, I now deny Fairchild's motion for sanctions, deny an oral motion made by 3D at hearing for attorney fees and costs, grant in part and deny in part Fairchild's motion to strike the Shore declaration, grant 3D's Rule 56(f) motion, and grant in part and deny in part 3D's motion to amend the scheduling order.

## I.  Motion for Sanctions

## A.  Applicable Legal Standards

While the First Circuit has not definitively resolved the matter of the standard applicable to modification of a protective order, it has expressed the view that "a standard less restrictive than 'extraordinary circumstances' is appropriate[,]" noting that other courts have applied "much more lenient standards for modification[,]"  including the standard of "good cause."  *Public Citizen v. Liggett Group Inc*., 858 F.2d 775, 791 (1st Cir. 1988).  I shall apply that standard in this case. Fairchild, as the party seeking to modify the protective order, bears the burden of showing good cause for the modification.  *See, e.g., Guzhagin v. State Farm Mut. Auto. Ins. Co*., Civil No. 07-4650 (JRT/FLN), 2009 WL 294305, at *2 (D. Minn. Feb. 5, 2009).[5]

_____

[5] The *Guzhagin* court sensibly held: "When a party to a *stipulated* protective order seeks to modify that order, that party must demonstrate particular good cause to obtain relief."  *Guzhagin*, 2009 WL 294305, at *2 (citation and internal quotation marks omitted) (emphasis in original).  The parties entered into a stipulated protective order in this case.  *See* Confidentiality Order.  Because I conclude that Fairchild has not shown good cause to modify that order, I need not consider whether it is necessary to make a more stringent showing.

## B. Factual Background

### 1. Motion To Strike

As a threshold matter, Fairchild moves to strike a declaration of Shore attached to a surreply[6] filed in support of 3D's opposition to the Motion for Sanctions. *See* Motion To Strike; Declaration of Michael W. Shore in Support of Third Dimension Semiconductor, Inc.'s Sur-reply in Support of Its Opposition to Fairchild Semiconductor Corp.'s Motion for Sanctions Including Enforcement and Modification of the Confidentiality Order ("Shore Decl./Sanctions Surreply"), attached to Third Dimension Semiconductor, Inc.'s Sur-reply in Support of Its Opposition to Fairchild Semiconductor Corporation's Motion for Sanctions Including Enforcement and Modification of the Confidentiality Order ("Sanctions Surreply") (Docket No. 273). Fairchild correctly points out that paragraph 8 of the declaration violates the parties' express written agreement, as a condition to discussions held on March 31, 2009, that "neither the content nor the fact of the meeting will be admissible in any court proceedings for any purpose." Motion To Strike & Exh. A thereto.

3D rejoins that (i) Fairchild waived any objection by placing in evidence Shore's March 26, 2009, e-mail, which related to the March 31, 2009, meeting, (ii) Federal Rule of Evidence 408 permits admission of settlement discussions for this purpose, and (iii) Fairchild has itself violated Rule 408 by placing settlement negotiations in evidence. *See* Third Dimension Semiconductor, Inc.'s Response to Fairchild Semiconductor Corporation's Motion To Strike the Declaration of Michael W. Shore (Docket No. 281) at 2-6.

---

[6] I granted 3D's motion to file a surreply to afford it an opportunity to respond to new material presented in the defendant's reply. *See* Docket No. 272.

The gravamen of Fairchild's objection is that 3D violated an express written agreement with respect to this particular meeting.  It is irrelevant whether the information otherwise would be admissible under Rule 408 or whether Fairchild elsewhere violated Rule 408.  Nonetheless, Fairchild's requested remedy of striking the entire declaration is clearly overbroad.  Excision of a select portion of paragraph 8, namely, all but the first sentence, accomplishes the purpose of removing the offending material while affording 3D, as a matter of fairness, the opportunity to explain the genesis of the March 26, 2009, e-mail that Fairchild placed in evidence.  The Motion To Strike accordingly is **<u>GRANTED</u>** to that extent, and otherwise **<u>DENIED</u>**.  3D shall forthwith file a substitute declaration of Shore expunging the offending material in the manner described above.

### 2.  Initiation of Instant Suit; Entry of Confidentiality Order

Fairchild filed the instant suit against 3D on May 17, 2008, seeking a declaratory judgment, *inter alia*, that it did not owe royalties to 3D pursuant to a patent licensing agreement between the parties because it manufactured no product that, but for the existence of the licensing agreement, would infringe any of the four patents covered thereunder.  *See* Complaint for Declaratory Judgment ("Complaint") (Docket No. 1) ¶¶ 1, 19, 23, 25; Patent License Agreement ("Licensing Agreement"), Exh. A thereto.  Fairchild alleged that an actual controversy between the parties existed because 3D had accused Fairchild of breaching the Licensing Agreement by failing to pay royalties on Fairchild's so-called SuperFET products, which 3D asserted were covered by at least one claim of two of the four licensed patents, U.S. Patent No. 5,216,275 (the "'275 Patent") and Chinese Patent No. 91101845 (the "CN '845 Patent").  *See id.* ¶¶ 7, 19, 23.

On August 28, 2008, the court adopted the parties' stipulated Confidentiality Order, which provides, *inter alia*, for designation of information as Highly Confidential "only if it would provide a competitive advantage to others in the same business as the disclosing party."  Confidentiality Order

¶ 3.   The order notes: "Such information may include, for example, software code, pricing information, customer lists, and trade secrets." *Id*.  The order provides that documents designated as Highly Confidential "shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in ¶ 5(b) for any purpose whatsoever other than to prepare for and to conduct discovery and trial in this action, including any appeal thereof."  *Id*. ¶ 5(a).  Those permitted to access Highly Confidential information include "[c]ounsel for the parties and employees of counsel who have responsibility for the preparation and trial of the action[.]"  *Id*. ¶ 5(b)(1).  The order bars the parties and their consultants or employees from access to information designated as Highly Confidential.  *Id*. ¶ 5(b)(2).

### 3.  Shore's Relationship to 3D

Shore personally owns about three percent of 3D's stock.  *See* Transcript of Deposition of Samuel Anderson ("Anderson Dep."), Exh. 2 to Declaration of Patrick J. Conroy in Support of Defendant's Response to Plaintiff's Motion To Compel the Continued Deposition of Samuel Anderson and Motion for Sanctions, Exh. A to Third Dimension Semiconductor, Inc.'s Response to Plaintiff's Motion To Compel Continued Deposition of Samuel Anderson and Motion for Sanctions (Docket No. 78), at 14-15.  In addition, through an entity known as Shofin Enterprises LLC, of which Shore is a part owner, he has an investment interest in Power Mosfet Technologies, LLC ("PMT"), which was formed on July 23, 1999, for the purpose of acquiring and asserting United States and Chinese patents.  *See* Exhs. 2-6 to Declaration of Robert H. Stier in Support of Plaintiff's Motion for Sanctions Including Enforcement and Modification of Confidentiality Order ("Stier Decl.") (Docket No. 197).  In turn, PMT partly owns 3D.  *See* Anderson Dep. at 16 (PMT owns less than [**REDACTED**] percent of 3D).

On February 4, 2001, in his capacity as general counsel for PMT, Shore executed a supplement to the assignment of the '275 Patent from Xingbi Chen and the University of Electronic Science and Technology of China to PMT.  *See* Exh. 5 to Stier Decl.  On February 5, 2001, in his capacities as both general counsel and manager for PMT, Shore executed the Licensing Agreement. *See* Licensing Agreement at 11.  On January 31, 2002, in his capacities as both general counsel and manager for PMT, he executed PMT's assignment of the Licensing Agreement to 3D.  *See* Exh. B to Complaint.

Shore is a member, along with 3D Chief Executive Officer ("CEO") Samuel Anderson, of the three-person board of directors of 3D.  *See* Anderson Dep. at 16.  While 3D has had as many as [**REDACTED**] employees, it now has only two, including Anderson.  *See id*. at 17; Declaration of Samuel Anderson in Support of Third Dimension Semiconductor Inc.'s Response in Opposition to Fairchild Semiconductor Corporation's Motion for Sanctions Including Enforcement and Modification of the Confidentiality Order (Docket No. 242) ("Anderson Decl.") ¶ 2.

Throughout negotiations leading up to the filing of the instant suit, Fairchild knew that Shore was a small investor in 3D.  Declaration of Michael W. Shore in Support of Third Dimension Semiconductor, Inc.'s Response to Fairchild Semiconductor Corporation's Motion for Sanctions Including Enforcement and Modification of the Confidentiality Order ("Shore Decl./Sanctions Opposition") (Docket No. 241) ¶ 25.  Even so, Fairchild agreed to the Confidentiality Order.  *See id*. Shore avers that he is no more a competitor now than he was when Fairchild agreed to that order. *See id*.

As CEO, Anderson is responsible for 3D's day-to-day operations, including its licensing activities.  *See* Anderson Decl. ¶ 3.  He is exclusively responsible for identifying potential licensees of 3D's patent portfolio and approaching them.  *See id*.  In doing this, he typically sets up a meeting

with executives of the potential licensees and discusses what patents they may be interested in licensing. *See id*. He alone has authority to negotiate the terms of a license agreement and to execute that agreement on behalf of 3D. *See id*.

Shore is not an employee or officer of 3D and has nothing to do with its day-to-day management. *See* Shore Decl./Sanctions Opposition ¶ 28. He has never met a 3D customer and does not set 3D's prices. *Id*. He does not design 3D's products. *See id*. He has not participated in the prosecution of its patents, as he is not licensed to practice before the U.S. Patent and Trademark Office. *See id*. He is not an engineer. *See id*. Although he is an outside director of 3D, he has not attended a board meeting since the instant suit was filed, and has no plans to do so. *See id*. He has never signed a contract, hired or fired an employee, negotiated a license agreement, or performed any other "day to day" act for 3D beyond acting as its litigation counsel. *See id*.

In 3D's negotiations with Fairchild, Anderson performed all face-to-face negotiations on 3D's behalf. *See id*. ¶ 29. He directs Shore in Shore's communications with Fairchild's counsel. *See id*. Robert Stier, Fairchild's outside litigation counsel, has also been present for each negotiation that Shore, in his role as outside counsel, attended. *See id*. Shore was present only when Stier was also present. *See* Anderson Decl. ¶ 7. [**REDACTED**.]

Anderson has negotiated every 3D license with third parties since 3D bought the patents subject to the Licensing Agreement from PMT, including licensing negotiations with Fairchild. *See* Shore Decl. ¶ 29. Shore has never signed a document as a representative for 3D, and signed the Licensing Agreement as a member of PMT, not on behalf of 3D. *See id*. He does not have the authority to independently negotiate licenses with Fairchild. *See id*.

#### 4. Shore's E-Mail Communications With Infineon's Counsel

On November 13, 2008, Gary Dauser, Senior Director, Licensing, for Infineon Technologies AG ("Infineon") e-mailed Fairchild in-house counsel Joel Pond, stating: "So you are not taken by surprise, Infineon is currently discussing the terms of a deal to sell Infineon patents to Third Dimension.  This is a follow up to our earlier settlement with them."  Exh. 1 to Declaration of Joel Pond in Support of Plaintiff's Motion for Sanctions Including Enforcement and Modification of Confidentiality Order ("Pond Decl.") (Docket No. 196).  On or about November 19, 2008, during the course of negotiations with Dauser, Pond was advised that Shore had approached Infineon about buying approximately five patents, including patents relating to superjunction technology, to assert against Fairchild.  *See* Pond Decl. ¶ 4.  Dauser also informed Pond of "a statement in an email from Shore, to our outside counsel, where Shore made a statement that Fairchild's documents prove they copied CoolMOS."  Exh. 2 to Pond Decl.  However, Dauser stated that "neither Infineon nor our outside counsel have any Fairchild documents from Shore on this topic."  *Id*.

Following the preliminary injunction hearing held in this case on November 21, 2008, *see* Docket No. 132, Stier informed Shore that Fairchild had been told that he had recently represented to Infineon's lawyers that he had obtained documents from Fairchild in showing that Fairchild had copied CoolMOS.  *See* Exh. 15 to Stier Decl.  Shore asked where this information came from, and asked that any concerns be put in writing.  *See id*.  Stier penned a letter requesting that Shore provide Fairchild with "the facts concerning communications you have had, if any, with Infineon's lawyers or representatives about documents or information obtained from Fairchild in discovery."  *Id*.  Shore denied that he had ever disclosed confidential information to Infineon or anyone else about Fairchild's products, stating that he possessed non-confidential information that revealed that Fairchild copied CoolMOS.  *See* Exh. 18 to Stier Decl.

In subsequent communications, Shore continued to deny any misuse of confidential Fairchild information.  *See* Exhs. 19-21 to Stier Decl.  However, because in Fairchild's view, Shore never answered its question concerning his communications with Infineon's counsel, it subpoenaed Shore's communications from Infineon's counsel in Texas, Baker Botts LLP ("Baker Botts").  *See* Motion for Sanctions at 9; Stier Decl. ¶¶ 2, 12-15, 23.

Those communications included:

1.     An August 20, 2008, e-mail from Shore to attorney Jeffrey Baxter of Baker Botts stating: "If you read the transcript of our hearing in Maine last month, Fairchild's counsel literally represented to the Court that Fairchild's products are 'essentially the same' as CoolMOS products by Infineon.[7]  I don't know what IP [intellectual property] Infineon holds in the area of superjunction multiple-epi products, but I bet the assertion of those patents against Fairchild – in combination with our 7 patents – would yield some potentially profitable results.  If our clients can resolve their differences, perhaps there are some other fish than can be fried to our mutual profit."  Exh. 17 to Stier Decl.

2.     A September 19, 2008, e-mail from Shore to Baxter stating: "I have claim charts for 4 Infineon patents that read on Fairchild's SuperFet devices.  If 3D and Infineon reach some kind of deal, would you be interested in jointly representing Infineon on a contingency basis in Tyler or Dallas?  We can do some pretty simple reverse engineering to finish the Rule 11 investigations to the point that filing would be supported.  Fairchild's sales are not real significant now, but looking long-term, it could be lucrative, especially if Rohm and Toshiba parts also take off.  With the current 3D

---

[7] The hearing transcript is publicly available.  *See* Docket No. 27.

portfolio and the 4-6 Infineon patents that are likely to be valid to some extent, I think there is a real opportunity to jointly control the multiple-epi market for many years." Exh. 11 to Stier Decl.

3.    An October 15, 2008, e-mail from Shore to Baxter stating: "I have claim charts showing Fairchild's SuperFet products infringe at least two Infineon patents.  If IFX is interested in a contingency deal to enforce those, we would do it for 40% of the recovery." Exh. 12 to Stier Decl.

4.    An October 21, 2008, e-mail from Shore to Baxter stating: "[G]et us permission to sue Fairchild so we can both make lots of money for Infineon." Exh. 13 to Stier Decl.

5.    A November 7, 2008, e-mail from Shore to Baxter stating: "Let's sue Fairchild.  Their documents prove they blatantly copied CoolMos.  Slam dunk.  Contingency would be huge." Exh. 1 to Stier Decl.

6.    A November 27, 2008, e-mail from Shore to Baxter stating: "Infineon sued Fairchild in Delaware yesterday based upon the claim charts we did for them.  Fish is the counsel for Infineon. We have charts on 6 other Infineon patents, but obviously will not be sharing them.  Did you pitch the case?  Fish will not do one on contingency, so Infineon is going to pay a lot, but hopefully force royalties down Fairchild's throat to make them non-competitive." Exh. 14 to Stier Decl.

An SCB associate forwarded one claim chart to Infineon regarding a Fairchild SuperFET part on November 3, 2008.  *See* Exh. A to Third Dimension Semiconductor, Inc's Motion for Limited Discovery and Request for Extension of Time To File Its Response in Connection with Fairchild Semiconductor Corporation's Motion for Sanctions ("Motion for Limited Discovery") (Docket No. 199).[8]  3D has represented that neither Shore nor SCB forwarded any additional claim charts to Infineon, and that none of the claim charts relied upon Fairchild's Confidential or Highly

---

[8] This document is referenced in Fairchild's reply in support of its Motion for Sanctions. *See* Sanctions Reply at 2.

Confidential information, but rather on publicly available materials and 3D's own reverse engineering. *See* Motion for Limited Discovery at 4-5 n.11.

3D denies that Shore ever offered to buy patents from Infineon. *See* Shore Decl./Sanctions Opposition ¶ 30. According to 3D, the backdrop to Shore's communication with Infineon regarding patent purchases is as follows.

Anderson, unaccompanied by Shore, participated in recent licensing negotiations with Infineon. *See id.* Anderson traveled alone to Germany to meet with Infineon's representatives. *See* Anderson Decl. ¶ 5. He negotiated the terms of a license and signed it on 3D's behalf. *See id.* Anderson only informed Shore of the state of the negotiations and the final terms and asked him to proof the documents. *See* Shore Decl./Sanctions Opposition ¶ 30.

During Anderson's negotiations with Infineon, its representatives proposed purchasing some of 3D's patents. *See* Anderson Decl. ¶ 6. Infineon representatives also proposed selling several of Infineon's patents to 3D, suggesting that they could help 3D in other litigation. *See id.* Fairchild was the only party besides Infineon with which 3D was involved in litigation at that time. *See id.* Because of Shore's prior relationship with Infineon's counsel, Anderson informed Shore of the potential patent infringement case involving the Infineon patents and instructed him to contact Infineon's counsel in an attempt to close the purchase of the patent by 3D. *See id.* Shore contacted Infineon's counsel at Anderson's request. *See id.*

### 5. Shore's Recent E-Mail Communications with Fairchild's Counsel

In the course of exchanging e-mails regarding Rule 408 communications with Stier, Shore e-mailed Stier on December 1, 2008: "A lot of people seem to be planning to manufacture these things soon and are looking for coverage. Very interesting time to be in the SJ [superjunction] business."

12

Exh. 3 to Declaration of Michael J. Sullivan in Support of Plaintiff's Reply in Support of Its Motion

for Sanctions ("Sullivan Decl.") (Docket No. 257).

> Shore e-mailed Stier on March 13, 2009:
>
> I will soon be filing inter-parties re-examination requests on several Fairchild patents in the area of superjunction technology. These will be filed unless Fairchild agrees to a broad cross-license with 3D that includes the payment of 3% royalties on all superjunction products Fairchild manufactures from March 15, 2009 forward.
>
> Fairchild would get a license to far more patents at a lower royalty rate and not have it[s] own patents invalidated, including those it is asserting against Infineon. It would also avoid an adverse result in China, litigation costs, re-exam costs, the destruction of it[s] case against Infineon, the loss of it[s] superjunction portfolio and my incentive to mine the 67,000 patents I have under management to attack all of Fairchild's product lines.

Exh. 1 to Sullivan Decl.

On March 26, 2009, Shore e-mailed Joel Pond, Fairchild's inside counsel, with a copy to

Stier, stating that he had seen an article that day about Fairchild's cost-cutting moves and adding: "I

know a party that might be interested in purchasing Fairchild's idled manufacturing equipment."

Exh. 2 to Sullivan Decl.  He asked Fairchild to send him a list of the available equipment if it was

interested in selling some of it.  *See id.*

Shore avers that his March 13, 2009, e-mail to Stier was a Rule 408 settlement

communication, authorized by Anderson and sent at Anderson's instruction.  *See* Shore

Decl./Sanctions Surreply ¶ 7.  The 67,000 patents to which he referred in that e-mail are patents held

by SCB's clients, not Shore's personally.  *See id.*  SCB manages those patents for its clients' benefit,

including reviewing the portfolios to identify infringers and potential licensees.  *See id.*  It is Shore's

obligation to his clients as their attorney to look for and investigate potential infringement of the

clients' patents in all areas of technology, not just multiple epitaxial (or trench) superjunction

devices.  *See id.*

The March 26, 2009, e-mail to Pond from Shore was sent at the direction of Anderson as a Rule 408 settlement communication. *See id*. ¶ 8.  Shore is not involved in pricing, product design, marketing, patent prosecution or acquisition, or other non-litigation based, competitive decision-making concerning 3D. *See id*. ¶ 9.

### 6.  Impact of Proposed Modification

Detailed information on the structure and electrical properties of Fairchild's SuperFET, SupreMOS, and IGBT parts are absolutely necessary for 3D to prove its case. *See* Shore Decl./Sanctions Opposition ¶ 22.  Much of this information can only be found in Fairchild's documents. *Id*.  3D does not have the funds to retain new counsel for this case. *See* Anderson Decl. ¶ 8.  If SCB were unable to continue to represent 3D in this litigation, 3D could not afford to replace SCB.  *See id*.

### C.  Discussion

### 1.  Overview: Competitive Decisionmaking

Fairchild relies on Shore's asserted status as a "competitive decisionmaker" as a basis to oblige him to disgorge all Highly Confidential information thus far received in this suit and to deny him access to any further such information, absent a showing of cause to access it. *See* Motion for Sanctions at 20-21; Sanctions Reply at 1-3.  While, as Fairchild's counsel acknowledged at hearing, it has no evidence that any other member of SCB is a competitive decisionmaker for 3D, *see* Hearing Transcript at 46, it presses to extend these restrictions to the entire SCB law firm, *see* Motion for Sanctions at 18 (citing *Andrx Pharms., LLC v. Glaxosmithkline, PLC*, 236 F.R.D. 583, 587 (S.D. Fla. 2006)).

"In a patent case, maintaining the integrity of the protective order is an especially serious concern." *Motorola, Inc. v. Interdigital Tech. Corp*., No. Civ.A. 93-488-LON, 1994 WL 16189689,

at *2 (D. Del. Dec. 19, 1994).  "Courts dress technical information with a heavy cloak of judicial protection because of the threat of serious economic injury to the discloser of scientific information." *Id*. (citation and internal quotation marks omitted).  "[W]here the parties are competitors in a particular field, there is danger that one party may use such information to the competitive disadvantage of the other."  *Northbrook Digital LLC v. Vendio Servs., Inc*., Civil No. 07-2250 (PJS/JJG), 2008 WL 2390740, at *13 (D. Minn. Apr. 4, 2008) (rec. dec., *aff'd in part and rejected in part on other grounds*, 2008 WL 2390737 (D. Minn. June 9, 2008).  Proprietary information typically is safeguarded by means of a protective order allowing documents to be designated for "attorneys' eyes only."  *See id*.  However, there are instances in which the nature of litigation counsel's relationship with a client/party is such as to raise a question as to whether even counsel should be barred from access to such information.

In particular, a red flag is raised when litigation counsel is engaged in "competitive decisionmaking," a "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor."  *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984).

An attorney's status as a competitive decisionmaker poses a heightened risk of inadvertent disclosure: "Inadvertence, like the thief-in-the-night, is no respecter of its victims."  *Id*.  "Whether an unacceptable opportunity for inadvertent disclosure exists . . . must be determined . . . by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained."  *Id*. (footnote omitted).  "[I]t is common knowledge that some retained counsel enjoy long and intimate relationships and activities with one or more clients, activities on occasion including retained counsel's service on a corporate board of

15

directors." *Id*. "Exchange of employees between a client and a retained law firm is not uncommon." *Id*. "Thus the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure." *Id*.

A trial attorney's status as a competitive decisionmaker is not alone dispositive of the question of whether it is appropriate to create or modify a protective order to bar him or her from accessing proprietary information. The court must perform a balancing test, weighing the risk of inadvertent disclosure and resultant harm "against the potential that the protective order may impair the other part[y's] ability to prosecute or defend its claims." *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co*., Civil Action No. 6:07-CV-346, 2008 WL 5634214, at *2 (E.D. Tex. Mar. 14, 2008). Factors to be considered include "[1] the level of risk of inadvertent disclosure of proprietary information, [2] the hardship imposed by the restriction, [3] the timing of the remedy, and [4] the scope of the remedy." *Id*. *See also, e.g., Northbrook*, 2008 WL 2390740, at *14 ("Since *U.S. Steel*, the competitive decisionmaking standard, with the hardship exception, has governed protective orders against patent counsel.").

### 2. Is Shore a Competitive Decisionmaker?

In urging the court to find Shore a competitive decisionmaker, Fairchild relies on his undisputed structural ties to 3D, e-mail communications that it asserts reveal in both substance and tone the actions of a superjunction business competitor rather than an independent outside counsel, and 3D's purported attempts to obtain discovery having no conceivable use in this litigation but seemingly relevant in other matters, such as the Infineon litigation against Fairchild and 3D's own separate litigation against Fairchild in China. *See, e.g*., Sanctions Reply at 1-6.

3D counters that there is no precedent for deeming outside trial counsel a competitive decisionmaker and, in any event, as the sworn statements of Shore and Anderson indicate, Shore is not a competitive decisionmaker for 3D.  *See, e.g.*, Sanctions Surreply at 4-6.

As a threshold matter, the competitive decisionmaking rubric is not misapplied to outside counsel.  *See, e.g., U.S. Steel*, 730 F.2d at 1468 ("[T]he factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure."); *ST Sales,* 2008 WL 5634214, at *7 ("Sales Tech also argues extensively that Pridham cannot be a competitive decisionmaker because his title is now strictly outside counsel to Sales Tech, and he is not an owner or employee of Sales Tech, IP Nav, or other Spangenberg entities.  However, Pridham's actual title is irrelevant to the pertinent analysis, as courts have found attorneys to be competitive decisionmakers regardless of whether they are in-house and outside counsel.").

The question of whether Shore qualifies as a competitive decisionmaker for 3D is a close one.  3D adduces evidence, in the form of the sworn affidavits of Anderson and Shore, that (i) Anderson is responsible for its day-to-day operations, including its licensing activities, (ii) he alone has the authority to negotiate the terms of a license agreement and to execute it on behalf of 3D, (iii) Shore is not an officer or employee of 3D, has not participated in the prosecution of its patents, and has not negotiated a license agreement on its behalf, (iv) Shore did not offer to buy patents from Infineon but rather merely contacted Infineon's counsel at Anderson's request after Anderson had engaged in substantive negotiations with Infineon representatives, (v) Shore has been present during 3D's negotiations with Fairchild only when his counterpart, Stier, likewise has been present, and (vi) although Shore does serve on 3D's board, he has not attended a meeting since commencement of this litigation and has no plans to do so.

Nonetheless, Shore's March 2009 e-mails create the distinct impression that, while he may not participate in negotiating license agreements *per se*, he is an active and substantive participant in patent litigation settlement negotiations that are themselves intertwined with 3D's licensing activities.

Notably, in Shore's March 13, 2009, e-mail, worded in the first person singular, he threatened, *inter alia*, to "mine the 67,000 patents I have under management to attack all of Fairchild's product lines" if Fairchild did not accede to 3D's settlement demand. Exh. 1 to Sullivan Decl. The settlement demand in question was that Fairchild agree to a broad cross-license with 3D that included payment of 3 percent royalties on all superjunction products that Fairchild manufactured from March 15, 2009, forward. *See id*.

Shore avers that (i) this was a Rule 408 settlement communication, authorized by Anderson and sent at Anderson's direction, (ii) the 67,000 patents to which he referred are held by SCB's clients, which include The California Institute of Technology, The Research Foundation of the State University of New York, The Board of Regents of The University of Texas System, Intersil Corporation, and Nanya Technology Corporation, rather than by him, and (iii) he has an obligation to those clients to look for and investigate potential infringement of their patents in all areas of technology. *See* Shore Decl./Sanctions Surreply ¶ 7 & n.6. Nonetheless, even taking these averments at face value, Shore's threat to mine the sizable stable of patents held by SCB's clients in the service of 3D's interests betrays his active participation in the substance of the parties' settlement negotiations, crossing the "outside counsel" line.[9]

---

[9] I have not considered whether threat of litigation on behalf of other SCB clients in order to gain an advantage for 3D implicates Shore's duty of loyalty under the Bar Rules to those other SCB clients.

In a similar vein, Shore's March 26, 2009, e-mail to Fairchild in-house counsel Joel Pond, on which outside counsel was copied, bears the earmarks of a communication from a direct player, with Shore stating: "I know a party that might be interested in purchasing Fairchild's idled manufacturing equipment."  Exh. 2 to Sullivan Decl.  Shore counters that this, too, was a Rule 408 communication sent at Anderson's direction.  *See* Shore Decl./Sanctions Surreply ¶ 8.  Even accepting that Shore sent this e-mail in his capacity as 3D's emissary, language matters.  He chose to communicate more in the manner of a competitor/businessman than an independent outside counsel.

Tellingly, in addressing the subject of the March 2009 e-mails, Shore avers that he is not involved in pricing, product design, marketing, patent prosecution or acquisition, or "*other non-litigation based, competitive decision-making* concerning 3D."  Shore Decl./Sanctions Surreply ¶ 9 (emphasis added).  A reasonable inference, consistent with the tone and substance of his March 2009 e-mails, is that he *is* involved in *litigation-based* competitive decisionmaking for 3D.  Courts have found substantive involvement in negotiating settlement of patent litigation, particularly when intertwined with creation of new licensing agreements, sufficient to evidence competitive decisionmaking status.  *See, e.g., Northbrook*, 2008 WL 2390740, at *16 ("Involvement in a party's licensing activity . . . implicates competitive decisionmaking."); *Affymetrix, Inc. v. Illumina, Inc*., No. Civ.A. 04-901-JJF, 2005 WL 1801683, at *2 (D. Del. July 28, 2005) (in-house counsel's status as part of defendant's management team and involvement with settling patent litigation and licensing crossed the line into competitive decisionmaking); *Intel Corp. v. Via Techs., Inc*., 198 F.R.D. 525, 530 (N.D. Cal. 2000) (in-house counsel's "involvement in licensing through litigation constitutes competitive decisionmaking, because her advice and counsel necessarily affect licensing decisions.").

To the extent that Shore's and Anderson's averments raise doubts, I resolve them against 3D in view of the context in which these e-mail communications were sent, including Shore's direct and indirect ownership interests in 3D, his status as a 3D board member, his role in negotiating the licensing agreement here in issue, albeit on behalf of PMT, his close contact with 3D's CEO, who is one of only two 3D employees, *see ST Sales*, 2008 WL 5634214, at *6 (noting case in which court had denied counsel access to confidential information "primarily because counsel took his ultimate instructions in the litigation from a single individual who was for all intents and purposes the client corporation, and there were no safeguards resulting from a layered managerial hierarchy") (citation and internal punctuation omitted), and his own comments revealing that, even in the course of soliciting litigation business for SCB from a third party, Infineon, he had 3D's competitive interests firmly in mind, *see, e.g.*, Exh. 11 to Stier Decl. (September 19, 2008, e-mail to Baxter stating, "Fairchild's sales are not real significant now, but looking long-term, it could be lucrative, especially if Rohm and Toshiba parts also take off. *With the current 3D portfolio and the 4-6 Infineon patents that are likely to be valid to some extent, I think there is a real opportunity to jointly control the multiple-epi market for many years*.") (emphasis added); Exh. 14 to Stier Decl. (November 27, 2008, e-mail to Baxter stating: "Infineon sued Fairchild in Delaware yesterday based upon the claim charts we did for them.  Fish is the counsel for Infineon. . . .  Fish will not do one on contingency, so Infineon is going to pay a lot, *but hopefully force royalties down Fairchild's throat to make them non-competitive*.") (emphasis added).[10]

---

[10] As evidence of Shore's status as a competitive decisionmaker, I need not and do not rely on his or 3D's alleged discovery abuses, *see, e.g.*, Motion for Sanctions at 3, 5-7, 19-20, for which Fairchild has not sought redress pursuant to Federal Rules of Civil Procedure 26(c) or 30(d)(3) or any other vehicle.

### 3. Balance of Hardships

Having resolved doubts in favor of a finding that Shore is a competitive decisionmaker, I go on to balance the hardship to 3D of granting the requested relief against the hardship to Fairchild of its denial. Application of that test points strongly in one direction: that Fairchild's bid for modification should be denied.

First and foremost, Fairchild's bid for modification comes late in the game. As 3D observes, *see* Sanctions Opposition at 17, the parties are in the latter stages of a lawsuit involving, simultaneously, complex issues of infringement of both U.S. and Chinese patents, contract law, semiconductor device physics, a preliminary injunction, international law jurisdiction, a current appeal to the Federal Circuit, and now a petition for certiorari to the United States Supreme Court.

Fairchild endeavors to minimize the impact of its requested modification on 3D, arguing that 3D does not need any Highly Confidential information to prove its case, but that in any event it would be permitted to show cause why SCB should retain or obtain access to such information. *See* Motion for Sanctions at 20; Sanctions Reply at 6-7. I am unpersuaded. 3D forcefully argues that (i) the modification would in effect disqualify SCB as its counsel in this matter because the information in question is critical, (ii) 3D's counsel would be obliged to disgorge information that they have already committed to work product and trial preparation, and (iii) it is patently unfair to permit Fairchild's counsel to go to trial with the benefit of information to which 3D's counsel have been denied access. *See* Sanctions Opposition at 15-16; Shore Decl./Sanctions Opposition ¶ 22; Hearing Transcript at 41, 61. 3D understandably takes little comfort from the suggested "amorphous" show cause mechanism. *See* Sanctions Opposition at 14, 16.

Even assuming *arguendo*, as Fairchild contends, that 3D's plaint that it is unable to afford substitute counsel rings hollow, *see* Sanctions Reply at 6-7, in these circumstances, the proposed

modification would work a severe hardship on 3D, *see, e.g., U.S. Steel*, 730 F.2d at 1468 ("Because the present litigation is extremely complex and at an advanced stage, and because present in-house counsel's divorcement from competitive decisionmaking has been accepted by the CIT [Court of International Trade], forcing [U.S. Steel] to rely on newly retained counsel would create an extreme and unnecessary hardship.").

Second, the force of Fairchild's argument that it requires limitation of opposing counsel's access to Highly Confidential information to safeguard its trade secrets and other Highly Confidential information is undercut by the fact that Shore and SCB already have had access to the bulk of that information, some of it since August 2008. As Fairchild's counsel acknowledged at hearing, once rung, the bell cannot be unrung. *See* Hearing Transcript at 14. While it is true, as Fairchild's counsel went on to suggest, *see id.* at 18-19, that SCB's disgorgement of Highly Confidential documents would incrementally diminish the risk of inadvertent disclosure, the bulk of the harm targeted in *U.S. Steel* and its progeny has already been done: the risk that attorneys, once they have accessed such information, will be unable to compartmentalize it in their own minds. *See, e.g., U.S. Steel*, 730 F.2d at 1468; *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1471 (9th Cir. 1992) (magistrate had to consider "not only whether the documents could be locked up in cabinets, but also whether Brown Bag's counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure to his employer once he had read the documents").

Beyond this, the core documents that 3D continues to seek and considers critical to its trial preparation and ability to respond to Fairchild's pending motion for summary judgment are SupreMOS-related documents. *See, e.g.*, Motion To Amend at 4; Rule 56(f) Motion at 5-6. Fairchild itself notes that it *already* has produced thousands of pages of such documents to 3D. *See, e.g.*, Plaintiff's Opposition to Defendant's Motion Pursuant to Rule 56(f) of the Federal Rules of

Civil Procedure ("Rule 56(f) Opposition") (Docket No. 262) at 5.  In fact, it argues that the additional SupreMOS discovery that 3D seeks is generally cumulative of the documents already provided.  *See id*.  The proposed modification thus would afford comparatively little protection to Fairchild as opposed to the harm to 3D.

Third, Fairchild has known since before the filing of this suit that Shore was a small investor in 3D, but nonetheless stipulated to the Confidentiality Order.  Fairchild explains that it "had assumed that, notwithstanding Attorney Shore's multiple roles, he would scrupulously behave as an officer of the Court, with toes never touching, much less crossing the line established by the [Confidentiality] Order."  Motion for Sanctions at 1-2.  Yet in so doing, Fairchild accepted some quantum of risk of at least inadvertent, if not deliberate, use of Highly Confidential information.  This, too, counsels against grant of its motion.  *See, e.g., SmartSignal Corp. v. Expert Microsystems*, *Inc.*, No. 02 C 7682, 2006 WL 1343647, at *1, *4 (N.D. Ill. May 12, 2006) (denying, on basis of laches, defendant's motion to amend stipulated protective order to bar one of the plaintiff's litigation attorneys, Pipke, from accessing confidential information and others, including Hetzler, from prosecuting patent applications on behalf of the plaintiff or a related company until two years post-litigation, when the defendant had known about Hetzler's patent work for years and had known for six months that Pipke, a shareholder in the plaintiff, had entered an appearance as litigation counsel; holding, "Because Plaintiff reasonably interpreted Defendant's decision not to act as acquiescing to

Hetzler and Pipke's participation in this case, and because Plaintiff relied heavily on Hetzler and Pipke to prepare its case over the last several months and years, laches applies.").[11]

For these reasons, Fairchild has failed to meet its burden of demonstrating good cause for the requested modification of the Confidentiality Order. The Motion for Sanctions accordingly is **DENIED**.

### 4. 3D's Motion for Attorney Fees and Costs

One further matter remains. At hearing, 3D made an oral motion for an award of attorney fees and costs on the basis that Fairchild has "now admitted that all these allegations they made are completely unsupportable in the record." Hearing Transcript at 44. 3D has also, in its papers and at hearing, described Fairchild's bringing of the Motion for Sanctions as an act of "gamesmanship." *See, e.g*., Third Dimension Semiconductor, Inc.'s Reply in Support of Its Motion To Modify/Amend the Scheduling Order, Extend Discovery, and Continue the Trial Date ("Reply/Motion To Amend") (Docket No. 250) at 6; Hearing Transcript at 28. I reject this argument. Fairchild received an alarming report in November 2008 from its competitor, Infineon, that Shore had contacted Infineon's counsel stating that he had Fairchild documents showing that Fairchild's SuperFET, which is at issue in this case, was a copy of Infineon's CoolMOS product. By then, Shore had been afforded access to a significant volume of Highly Confidential information.

---

[11] Nor, absent a finding that Shore actually misused Highly Confidential information in communications with Infineon or others, has Fairchild shown good cause for the burdensome further-requested relief of modification of the Confidentiality Order to direct 3D and SCB to produce copies of all communications since April 17, 2008, with third parties, including but not limited to Infineon and its counsel, that refer or relate to Fairchild. *See* Motion for Sanctions at 20. As counsel for 3D pointed out at hearing, the requested relief implicates 3D's communications with its consulting experts and trial witnesses, among others. *See* Hearing Transcript at 41. Moreover, 3D's counsel represented that "there have been absolutely no communications of any confidential information outside this firm, period, the end." *Id*. Fairchild falls short of demonstrating sufficient concern for the integrity of its Highly Confidential information to warrant this burdensome relief.

Fairchild promptly investigated, affording Shore an opportunity to respond and ultimately issuing a subpoena to Baker Botts.  Fairchild credibly explains that it refrained from filing the instant motion until the court had ruled on its motion for a preliminary injunction so that it could not be accused of using this motion to influence that ruling.  *See* Motion for Sanctions at 2 n.2.  To its credit, Fairchild has acknowledged that Shore's sworn evidence under oath, as an officer of the court, rebuts its circumstantial evidence of misuse.  *See* Hearing Transcript at 14, 45.  However, in bringing this motion, it adduced sufficient evidence to permit a reasonable inference that Shore misused Highly Confidential information.  For these reasons, 3D's request for attorney fees and costs is **<u>DENIED</u>**.

## II.  Motion To Amend Scheduling Order; Rule 56(f) Motion

### A.  Applicable Legal Standards

#### 1.  Modification of a Scheduling Order

"A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  "Rule 16(b)'s 'good cause' standard emphasizes the diligence of the party seeking the amendment."  *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 155 (1st Cir. 2004).  "Prejudice to the opposing party remains relevant but is not the dominant criterion."  *Id*.  "Indifference by the moving party seals off this avenue of relief irrespective of prejudice because such conduct is incompatible with the showing of diligence necessary to establish good cause."  *Id*. (citation and internal punctuation omitted).

#### 2.  Rule 56(f) Motion

Federal Rule of Civil Procedure 56(f) provides:

**(f) When Affidavits Are Unavailable.** If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(**1**) deny the motion;

(**2**) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(**3**) issue any other just order.

Fed. R. Civ. P. 56(f).  The First Circuit has held that a party seeking to invoke Rule 56(f) must establish:

> (i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion.

*Niemic v. Galas*, 286 Fed. Appx. 738, 741 (1st Cir. 2008) (citation and internal quotation marks omitted).

## B.  Factual Background

3D's motion to amend the scheduling order, and its Rule 56(f) motion, rest largely on Fairchild's non-production of documents that it agreed to produce in response to two requests for production, including a particularly significant subset that 3D terms the "Withheld Documents," consisting of (i) mask sets for production SupreMOS parts, (ii) actual process flows for production SupreMOS parts, (iii) SEMS [scanning electron miscroscope images] for production SupreMOS parts, (iv) SIMS [secondary ion mass spectroscopy] analysis for production SupreMOS parts, (v) device characterizations/simulations on production SupreMOS parts, and (vi) final design reports/analyses for production SupreMOS parts.  *See* Rule 56(f) Motion at 6; Reply/Motion To Amend at 3; Declaration of Patrick A. Traister in Support of Third Dimension Semiconductor, Inc.'s

Reply in Support of Its Motion To Modify/Amend the Scheduling Order, Extend Discovery, and Continue the Trial Date ("Traister Decl."), attached to Reply/Motion To Amend, ¶ 4.[12]

3D served its second request for production on December 9, 2008, and its third request for production on January 6, 2009. *See* Declaration of Patrick J. Conroy in Support of Third Dimension Semiconductor, Inc.'s Expedited Motion for Continuance Pursuant to Federal Rule of Civil Procedure 56(f) To Respond to Fairchild Semiconductor, Inc.'s Motion for Summary Judgment ("Conroy Decl."), attached to Rule 56(f) Motion, ¶¶ 3-4; Third Dimension Semiconductor, Inc.'s Second Set of Requests for Production to Plaintiff Fairchild Semiconductor Corp. ("Second RFP"), Exh. A thereto; Third Dimension Semiconductor, Inc.'s Third Set of Requests for Production to Plaintiff Fairchild Semiconductor Corporation ("Third RFP"), Exh. B thereto.

On January 7, 2009, Fairchild served a response to the Second RFP in which it stated, in response to a majority of 3D's requests, that, notwithstanding objections, it would produce responsive, non-privileged documents in its custody or control relating to its SuperFET products. *See* Plaintiff's Responses to Defendant's Second Set of Requests for Production ("Response to Second RFP"), Exh. C thereto, Responses ¶¶ 1-22, 26-35.[13]

On January 14, 2009, Judge Hornby granted in part 3D's motion to amend its answer and counterclaim, permitting it to assert a counterclaim for breach of contract predicated on Fairchild's

---

[12] In filing its Rule 56(f) Motion, 3D incorporated by reference the arguments and evidence presented in support of its Motion To Amend. *See* Rule 56(f) Motion at 6 n.30.

[13] Fairchild objected to the production of SupreMOS-related documents on the basis that the court had ruled that issues regarding payment of royalties on sales of SupreMOS parts were not yet ripe, and that the only product in issue in the case at that time was Fairchild's SuperFET product. *See* Response to Second RFP at 2, ¶ 3 (citing Memorandum Decision and Order on Defendant's Motion To Compel and for Sanctions ("Order on Motion To Compel") (Docket No. 154) at 13). There is no dispute that SupreMOS products are now in issue in this case.

sale of so-called "Trench Parts," *see* Docket Nos. 95, 168, which include SupreMOS parts, *see* Order

on Motion To Compel at 3.  That day, he also granted Fairchild's motion to amend its complaint to

assert a claim that 3D breached the Licensing Agreement's covenant not to sue when it filed a patent

infringement suit in September 2008 in The People's Republic of China against three Fairchild

entities.  *See* Docket Nos. 105, 170.

On January 16, 2009, 3D filed a notice of interlocutory appeal to the United States Court of

Appeals for the Federal Circuit.  *See* Defendant's Notice of Appeal (Docket No. 175).  On January

26, 2009, counsel for Fairchild informed 3D counsel Patrick Conroy for the first time that none of

the requested documents would be produced because of the Motion for Sanctions that it was

preparing to file.  *See* Conroy Decl. ¶ 10.  On January 27, 2009, 3D filed an emergency motion in the

United States Court of Appeals for the Federal Circuit for a stay of the instant action pending

disposition of 3D's pending interlocutory appeal.  *See* Report of Conference of Counsel and Order

("February 26 Report") (Docket No. 208).

On February 5, 2009, Fairchild served a response to the Third RFP in which it stated that,

notwithstanding objections, it would produce documents in response to certain requests, including

requests implicating the Withheld Documents.  Plaintiff Fairchild Semiconductor Corporation's

Responses to Third Dimension Semiconductor, Inc.'s Third Set of Requests for Production

("Response to Third RFP"), Exh. D to Conroy Decl., Responses ¶¶ 5-8, 10-16, 20.

Discovery closed on February 6, 2009.  *See* Amended Scheduling Order (Docket No. 65) at 2.

On that day, Fairchild filed its Motion for Sanctions.  *See* Motion for Sanctions.  Fairchild informed

3D that it would not produce any Highly Confidential information until that issue was decided.  *See*

Conroy Decl. ¶ 11.

Conroy had discussions with counsel for Fairchild in which both sides agreed to defer depositions past the discovery deadline to the extent that it was necessary to do so. *See id.* ¶ 12. To that end, 3D agreed to allow its expert Jia Sha to be deposed on March 24, 2009. *See id.* 3D sought to depose a Rule 30(b)(6) witness, continue the deposition of Dr. Jaegil Lee, and depose Joel Pond and Fairchild employee Christopher Rexer. *See* Reply/Motion To Amend at 7 n.38. However, Conroy avers that 3D was forced to defer those depositions because of Fairchild's refusal to produce relevant documents. *See* Conroy Decl. ¶ 7.[14]

In a teleconference with counsel held on February 26, I extended the parties' February 27 deadline for filing dispositive motions to the earlier of March 16 or one week following issuance of the Federal Circuit's ruling on 3D's emergency motion for a stay. *See* February 26 Report. On March 16, the parties filed motions for summary judgment and to exclude experts, and 3D filed its Motion To Amend. *See* Docket Nos. 210, 211, 213, 216, 223, 232. On March 25, the Federal Circuit denied 3D's emergency motion for a stay of this action. *See* Docket No. 249.[15] On March 31, 3D filed its Rule 56(f) Motion. *See* Rule 56(f) Motion.

As of March 31, Fairchild had produced no documents in response to the Second or Third RFP. *See* Conroy Decl. ¶ 7. Extensive discovery on SupreMOS parts remained outstanding, with

---

[14] Fairchild blames 3D for dropping the ball on the depositions requested by 3D, asserting, for example, that 3D served an unreasonably lengthy notice of Rule 30(b)(6) topics and did not get back to Fairchild on Fairchild's request to pare the scope of topics down. *See, e.g.*, Plaintiff's Opposition to Defendant's Motion To Modify the Scheduling Order, Extend Discovery and Continue the Trial Date ("Opposition/Motion To Amend") (Docket No. 246) at 1-2; Hearing Transcript at 67. Presumably, if 3D received the documents it says were unreasonably withheld, these details could be swiftly worked out.

[15] On April 3, 2009, the Federal Circuit denied a motion by 3D for reconsideration of its denial of the emergency stay. *See* Third Dimension Semiconductor, Inc.'s Expedited Motion To Stay District Court Proceedings Pending Disposition of Its Petition for Writ of Certiorari ("Stay Motion") (Docket No. 283) & attachments thereto. On April 15, 2009, 3D filed a petition for writ of certiorari in the United States Supreme Court challenging the Federal Circuit's denial of its motion for a stay. *See id.*

Fairchild having produced no documents to 3D since December 8, 2008. *See id*. ¶ 8. On Friday, April 3, Fairchild attempted to produce approximately 1,000 pages of documents to 3D's local counsel, John Whitman, with the proviso that they be withheld from SCB. *See* Hearing Transcript at 58, 63, 70. Because of that restriction, Whitman declined to accept the proffered production. *See id*. at 63, 71.

Prior to being served the Second RFP, Fairchild had produced SupreMOS-related documents to 3D on two occasions: between August 28 and September 5, 2008, when, in the course of producing SuperFET-related documents in response to 3D's first request for production, it produced approximately 260 documents, totaling more than 2,000 pages, that happened also to mention SupreMOS devices, and on November 18, 2008, when it voluntarily produced approximately 1,680 additional SupreMOS-related documents totaling about 19,000 pages, in acknowledgement that it had begun selling SupreMOS products on October 25, 2008. *See* Order on Motion To Compel at 3, 7.

Patrick Traister, a patent attorney with SCB who was a semiconductor process engineer with Intel Corporation prior to attending law school, has reviewed every document produced by Fairchild in this case. *See* Traister Decl. ¶¶ 2-3. He and a team working at his direction re-reviewed every document mentioning SupreMOS and prepared a summary of its contents. *See id*. ¶ 3. Traister does not believe that Fairchild has produced the documents to prove or disprove whether SupreMOS parts that are actually sold are covered by one of the licensed patents. *See id*. ¶ 4. None of the documents produced by Fairchild appear to be the Withheld Documents. *See id*. Fairchild has not produced the operational process flow for its production SupreMOS products. *See id*. ¶ 5. Fairchild likely possesses this document because it has already produced such a document for SuperFET. *See id*.

Traister also does not believe that Fairchild has produced the operational specifications for the individual steps of the SupreMOS process that should accompany the operational process flow for SupreMOS. *See id.* These types of documents are typically used in the semiconductor industry. *See id.* The most detailed document found on the SupreMOS process is the process flow "cartoon" that Fairchild submitted as Exhibit 10 to the Declaration of Michael Sullivan in Support of Plaintiff's Motion for Summary Judgment ("Sullivan Decl./SJ") (Docket No. 219). *See id.* ¶ 6. This document provides almost no detail on the actual "recipes" of the steps of the process. *See id.* Nor does it contain any indication that it is for an actual SupreMOS production part and not a development part. *See id.*

Dr. Richard Fair, a professor of electrical engineering at Duke University who has been retained as an expert witness for 3D in this case, declares that it is standard industry practice for semiconductor manufacturers to maintain detailed documents on the process steps, masks, and recipes used to manufacture each product that they produce. *See* Declaration of Dr. Richard Fair in Support of Third Dimension Semiconductor, Inc.'s Reply in Support of Its Motion To Modify/Amend the Scheduling Order, Extend Discovery, and Continue the Trial Date ("Fair Decl.") (Docket No. 251), ¶¶ 2-3. He further avers that detailed documents on the process steps, masks, and recipes used to manufacture a semiconductor product are necessary for any expert to opine on the structure of any semiconductor product with the level of scientific certainty used by experts in semiconductor design and manufacturing outside of the context of litigation. *See id.* ¶ 4. Such documents would be part of any expert's review. *See id.* For example, both Dr. Fair and Dr. Tat-sing Paul Chow, Fairchild's expert, reviewed detailed information on the process employed by Fairchild to manufacture its SuperFET product. *See id.* The cartoon attached as Exh. 10 to the Sullivan Declaration/SJ does not contain the level of specificity required for an expert to form an

opinion on the process by which Fairchild manufactures the SupreMOS product or the product's structure. *See id.* ¶ 6. The document contains almost no information on the actual process conditions and recipes employed at the operation steps. *See id.*[16]

At hearing, 3D's counsel further argued that (i) a declaration of Dr. Lee attached to Fairchild's motion for summary judgment refers to figures and simulations that 3D has never seen, (ii) it is highly prejudicial for 3D to attempt to respond to that motion without being able to review those underlying documents, and (iii) while 3D has its own reverse engineering, it requires Fairchild's documents to aid it in cross-examining Fairchild's experts. *See* Hearing Transcript at 58-59, 62.

The operative scheduling order in this case provides, *inter alia*, for designation of experts by December 3, 2008, designation of rebuttal experts by January 7, 2009, a discovery deadline of February 6, 2009, a deadline of February 27, 2009, for filing of dispositive motions and motions to exclude experts (subsequently extended to March 16, as previously noted), and an expected trial date

---

[16] Fairchild challenges 3D's evidence concerning the necessity of the Withheld Documents to oppose summary judgment on the bases that (i) Dr. Fair himself relied on 3D's own reverse engineering, rather than on Fairchild's documents, in opining on the structure of Fairchild's SuperFET devices and does not explain why he would proceed any differently with respect to its SupreMOS devices, *see* Rule 56(f) Opposition at 4, (ii) Dr. Fair disregarded the use of simulations in analyzing SuperFET devices, explaining that he was unable to run them, *see id.* at 4-5, (iii) 3D's anticipated arguments based on mask sets, process flows, and final design reports were rejected by Judge Hornby with respect to SuperFET products, *see id.* at 5, (iv) the cartoon document already produced to 3D provides a complete illustration of each step in the manufacture of a SupreMOS production part, with 3D failing to explain how it lacks sufficient detail to be useful, *see id.* at 5-6, and (v) in reviewing the documents that Fairchild had already produced, Traister overlooked a number of SupreMOS-related documents because he focused only on those referring to SupreMOS by name, as opposed to internal development or part number, *see id.* at 7. These points collectively fall short of rebutting the direct evidence under oath of Traister, a former semiconductor process engineer, and/or Dr. Fair that (i) the Withheld Documents are not among those previously produced to 3D, (ii) detailed documents on the process steps, masks, and recipes used to manufacture a semiconductor product are necessary for any expert to opine on the structure of any semiconductor product with the level of scientific certainty used by experts in semiconductor design and manufacturing outside of the context of litigation and would be part of any expert's review, and (iii) the cartoon document provides insufficient detail required for an expert to form an opinion on the process by which Fairchild manufactures SupreMOS products or the structure of those products.

of June 1, 2009.  *See* Amended Scheduling Order.  This case recently was removed from Judge Hornby's June trial list.  *See* Docket No. 275.

### C.  Discussion

3D seeks to amend the scheduling order to provide for an April 3, 2009, deadline for designation of experts, an April 17, 2009 designation of rebuttal experts, a May 29, 2009, deadline for completion of discovery, a June 19, 2009, deadline for filing of dispositive motions and motions to exclude experts, and a September 21, 2009 expected trial date.  *See* Motion To Amend at 6-7.  Through its Rule 56(f) Motion, 3D seeks to continue the deadline for its response to Fairchild's summary judgment motion related to SupreMOS parts until it has obtained its requested discovery.  *See* Rule 56(f) Motion at 10.

3D demonstrates good cause to modify the scheduling order, albeit not to the extent requested.  Fairchild represented, in a January 7 response to the Second RFP and a February 5 response to the Third RFP, that notwithstanding its interposition of various objections, it would produce certain of those documents.  On January 26, counsel for Fairchild informed 3D's counsel for the first time that none of the requested documents would be produced in view of Fairchild's anticipated filing of the Motion for Sanctions.  Upon the filing of that motion on February 6, Fairchild indicated that it would not produce any Highly Confidential documents pending the motion's resolution.  Until Fairchild recently served documents upon 3D's local counsel containing restrictions that 3D found unacceptable, no documents, whether Highly Confidential or not, were produced in response to either the Second or Third RFP.  3D plausibly explains that its lack of those documents contributed to its inability to complete Fairchild's Rule 30(b)(6) deposition, as well as the depositions of Pond and Rexer and a second deposition of Dr. Lee.  I perceive no lack of diligence in 3D's efforts to obtain those documents in the face of Fairchild's conflicting signals.  To

the extent that 3D was informed that documents would be produced, it reasonably afforded Fairchild a period of time to produce them.  When the documents were not forthcoming, it supportably could have concluded that they were being withheld, rightly or wrongly, on the basis of the pendency of the Motion for Sanctions.  The Motion To Amend does not come too late.

For the same reasons, for purposes of its Rule 56(f) Motion, 3D demonstrates good cause for its inability to have discovered or marshaled the necessary facts earlier in this proceeding.  There is no dispute that there is a probable basis to believe that additional facts exist and can be retrieved within a reasonable time.  Indeed, as noted above, Fairchild recently proffered to 3D local counsel, Whitman, approximately 1,000 pages of documents.  Finally, I am satisfied that 3D has adequately explained its need for the above-mentioned discovery (with respect to the Withheld Documents and the taking of depositions related thereto) to contest Fairchild's pending motion for summary judgment.

My finding of good cause to amend the scheduling order and to grant the Rule 56(f) Motion hinges solely on Fairchild's non-production of documents that it represented, in response to the Second and Third RFPs, that it *would* produce.  To the extent that 3D seeks to amend the scheduling order or to continue its deadline for opposing summary judgment on the basis of a purported need for documents that Fairchild did *not* represent that it would produce in response to those requests, 3D failed to bring those discovery disputes to the court's attention in a timely fashion in accordance with Local Rule 26(b).  Any requests for discovery of those documents will not be countenanced now.

For the foregoing reasons, the Rule 56(f) Motion is **<u>GRANTED</u>**, and the Motion To Amend is **<u>GRANTED</u>** in part, as follows:

1.      Fairchild shall produce to 3D, within seven calendar days of the date hereof, or by April 28, 2009, all documents that it represented it would produce in response to the Second and Third RFPs.

2.      3D shall be permitted, within 30 days thereafter, or by May 28, 2009, to take the Rule 30(b)(6) deposition of Fairchild, the depositions of Christopher Rexer and Joel Pond, and the deposition of Dr. Lee in South Korea.[17]

3.      Within seven calendar days thereafter, or by June 4, 2009, 3D shall file its response to Fairchild's motion for summary judgment.  The customary reply time shall follow.

### III.  Sealing of This Decision

I **DIRECT** the Clerk of the Court to seal this Memorandum Decision and Order when docketed.  The parties shall notify me by noon on Wednesday, April 22, 2009, whether this Decision and Order contains any confidential information that should remain sealed and, if so, indicate explicitly what language should be redacted, with due regard to the public's interest in access to court proceedings.  If I do not hear from the parties by noon on April 22, this Decision and Order will be unsealed.

### SO ORDERED.

Dated this 21st day of April, 2009.

                              /s/  John H. Rich III
                              John H. Rich III
                              United States Magistrate Judge

_____

[17] With respect to Dr. Lee, Fairchild takes the position that 3D failed to seek leave to depose him a second time pursuant to Federal Rule of Civil Procedure 30(a)(2)(A)(ii), but that if he is deposed again, he should be deposed in South Korea, where he lives and works.  *See* Hearing Transcript at 66-67; Opposition/Motion To Amend at 9 n.4.  I will treat 3D as having moved, via the pending motions, for leave to depose Dr. Lee a second time.  That motion is granted, with the proviso that the deposition be taken in South Korea.